WILLIAM V. BRADLEY, Individually and as President of the International Longshoremen's Association and as President of United Marine Division, ILA, Local 333, et al., Appellants, v. JOSEPH O'HARE, Individually and as President of Federal Labor Union No. 24948 New York United Marine Division, Local 333, AFL, et al., Respondents, et al., Defendants.

First Department, June 14, 1960.

*Seymour M. Waldman* of counsel (*Louis Waldman* and *Martin Markson* with him on the the brief; *Waldman & Waldman,* attorneys), for appellants.

*H. Howard Ostrin* of counsel (*Eugene N. Sosnoff* with him on the brief; *Herman E. Cooper,* attorney), for respondents.

BREITEL, J. This case involves the right to assets retained by a local labor union upon its secession from an international union.

In September, 1953 the International Longshoremen's Association (ILA) was expelled from the American Federation of Labor (AFL). The assigned ground was that it had "permitted gangsters, racketeers and thugs to fasten themselves to the body of its organization, infecting it with corruption and destroying its integrity, its effectiveness and its trade-union character".

In May, 1954 Local 333, affiliated with ILA, held a membership referendum on the question of secession from ILA and for affiliation with the United Mine Workers of America (UMW). The vote was 1,857 members in favor of secession, and 419 opposed. The Local thereupon withdrew from ILA. It kept $177,645.51 representing membership dues accumulated in its treasury. The recovery of this fund, together with some related relief, is the subject of the action.

Plaintiffs, representing ILA and a reconstituted local in ILA, seek to recover the funds from the seceded Local. ILA relies on its constitution which states that all moneys paid into a local are the property of ILA and are received by the local as trustee for the benefit of ILA. The constitution also provides that, in the event a local withdraws from ILA, all the property of the local shall revert to ILA for disposition by its executive council. Moreover, under the constitutions of ILA and of Local 333, the Local is prohibited from secession over the objection of 10 of its members.

After a trial without a jury, the trial court dismissed the complaint (19 Misc 2d 612). It concluded that such constitutional provisions, preventing secession and providing for purported reverter and forfeiture of assets, were contrary to public policy and, therefore, unenforcible. The trial court also found that William V. Bradley, president of ILA, had consented to the Local's secession. It was also found that, after the secession of Local 333, Bradley had caused to persist within ILA a "paper local" 333 lacking substance. On these findings, it was concluded that a judgment in favor of ILA or "paper local" 333 would work an inequitable forfeiture against Local 333 and its members, and the complaint was dismissed.

The proper rationale to be applied in disaffiliation cases is not easily ascertained. For the reasons later discussed the judgment in favor of defendants, representing the seceded Local, should be reversed, and a new trial granted.

It is concluded that the internal constitutional provisions upon which ILA relies are not contrary to public policy. Moreover, neither Bradley's consent to the secession, nor the fact that only a "paper local" remained after the secession, bars

recovery by ILA. But, because the AFL expelled ILA on a finding of widespread corruption, the Local may, upon a new trial, prevail in this action. This — because the AFL's finding of corruption established, unless avoided in a proper forum, that ILA had by such corruption destroyed its status as the intervening and controlling international in the trade-union hierarchy. Under the circumstances, continued affiliation would not be compelled of the ultimate beneficiaries — the worker members of Local 333. They, as distinguished from ILA and its membership at large, would, because of their beneficial interest, be entitled to retain the accumulated membership dues.

Most of the facts developed at the trial are not in dispute.

The ILA was formed in 1892 as an independent trade union. It received a charter of affiliation from the AFL in 1896. Despite its many difficulties over the years, ILA was, and still is, an active organization. It has over 65,000 members and several hundred local unions.

Local 333 was chartered by ILA in 1937. It has always represented shore-based workers from captain to deckhand on marine craft in the Port of New York. The Local originally attempted to obtain a charter from the AFL, but due to conflicts in jurisdiction with AFL craft unions, the charter was denied. Even after it had obtained a charter from ILA, and thereby became affiliated indirectly with the AFL, conflicts in jurisdiction arose between Local 333 and AFL craft unions. In these disputes, ILA assisted the Local in maintaining its jurisdictional complexion, despite the overlap with other craft unions.

Moreover, ILA was helpful in organizing the Local. It supplied the Local with full-time paid organizers and free office quarters and telephone service. ILA officials, while not participating in all phases of the Local's bargaining activities, have attended negotiations in their crucial final days. ILA has also assisted in the collective bargaining process by asserting secondary pressures on the shipowners through its longshoremen members.

In February, 1953, following public hearings held by the New York State Crime Commission regarding conditions on the New York waterfront, the executive council of the AFL demanded, under the threat of expulsion, that ILA take appropriate steps to eliminate corruption. The council's view was that the testimony before the Crime Commission provided clear and definite indication that the worker members in the Port of New York were being exploited and were not receiving the protection which they had a right to expect. Particular

reference was made to the evils stemming from the "shape-up" method of hiring, the acceptance of gifts and bribes by union officers from employers, the prevalence of union officers with criminal records, and the lack of democracy in the local unions.

After an exchange of correspondence and the appearance of ILA representatives before the executive council, the council concluded that ILA had failed to take the necessary remedial action to eliminate the condemned conditions. ILA was advised that the council would recommend to the AFL annual convention that ILA be suspended until it had taken the necessary action to comply in good faith with the council's request.

At the AFL annual convention held in September, 1953, and on the recommendation of the executive council, ILA's charter was revoked by a vote of 79,079 to 736. The revocation was pursuant to the constitution of the AFL. It appears that at no time did the executive council receive proof at a formal hearing.

Several weeks later, Local 333, by overwhelming vote, expressed its confidence in ILA and noted its decision to maintain its relationship. A special convention of ILA was called. Joseph P. Ryan, then president of ILA, resigned and Bradley was elected his successor. Bradley, a former tugboat captain, was one of the founders of Local 333 and remained its president. Joseph O'Hare, who now leads the seceded Local, became business manager of the Local upon Bradley's resignation from that important position, and also became a vice-president of ILA. At the convention, O'Hare stated that he felt "honored" by this appointment.

Meanwhile, the AFL had chartered a new international to compete with ILA. A jurisdictional election supervised by the National Labor Relations Board was held in December, 1953, and ILA emerged victorious by a narrow margin. This election, however, was set aside by the NLRB, and a new election was scheduled for May, 1954.

Fearing that the new election would result in the defeat of ILA and its collapse, O'Hare searched for a new affiliation for Local 333. Discussions were held with representatives of the AFL, the Seafarer's International Union (an affiliate of the AFL), and the National Maritime Union, CIO. UMW, however, offered the best prospect. Its financial position was strong and, unlike the AFL and the other groups, it was prepared to grant local autonomy.

By early May, 1954 matters had developed to the point that ballots were mailed to the 3,873 members of Local 333 on the question whether the Local should secede from ILA and join

UMW. The ballots were counted on May 28, 1954. The vote of the members was 1,857 in favor of secession and 419 opposed. On the same day O'Hare announced the withdrawal of Local 333 from ILA and the creation of the "United Marine Workers Division of District 50, United Mine Workers of America, Local M-333".

Even before the votes were counted, O'Hare withdrew the funds now in dispute and hid them. He told the Local's membership that this was done to avoid the possibility of Bradley's seizing the funds on behalf of ILA. At the trial, however, O'Hare testified that the funds were hidden "primarily" to avoid their being impounded by a receiver to pay a contempt fine which had been imposed against ILA.

There was a conflict in testimony as to whether or not Bradley consented to the Local's secession and transfer to UMW. For purposes of the appeal, ILA has conceded that Bradley consented to the disaffiliation.

This action was commenced in March, 1955, some 10 months after the secession. The Local claims that the suit was brought, not because it seceded from the ILA, but only because 7 months later, in December, 1954, it withdrew from UMW. In doing so the Local withdrew from the ally of ILA, and rejoined the AFL, the federation which had expelled the international for corruption. In this connection, the Local points to a series of substantial loans which were made by UMW to ILA. It argues that a suit by ILA against the Local, while it was affiliated with UMW, would have resulted in UMW's calling the loans. ILA contends, on the other hand, that the Local was advised of ILA's objection to the secession shortly after the event. It argues that the delay in commencing suit is explained by the fact that its then attorney, who also represented the Local, assured ILA that he might persuade the Local to reaffiliate. In support ILA points to O'Hare's admission that the attorney advised him in June, 1954 that ILA might bring suit.

It is appropriate to consider first the grounds urged by the Local and upon which the complaint was dismissed.

In holding the internal constitutional provisions upon which ILA relies to be contrary to public policy the trial court recognized that it was departing from established precedent (*Wolchok* v. *Durst*, 66 N. Y. S. 2d 295 [App. Term, 1st Dept.]; *Kidde & Co.* v. *United Elec. Radio & Mach. Workers*, 7 N. J. 528, 531–532; *Harker* v. *McKissock*, 7 N. J. 323, 330–334; *Grand Lodge* v. *Girard Lodge No. 100*, 384 Pa. 248, 255–261, cert. denied 351 U. S. 985; *Crocker* v. *Weil*, 38 CCH Labor Cases 67,877, 67,880–67,881

[Ore. Cir. Ct.]; Ann.: Local Union — Effect of Withdrawal, 23 A. L. R. 2d 1209).

Provisions in union constitutions of this sort, involving forfeiture or purported reverter of assets to the international, are the rule, rather than the exception. At least 19 of the 27 internationals represented on the AFL-CIO executive council have constitutions with provisions of similar tenor. While the prevalence of such provisions is not controlling, it suggests that they may serve an entirely valid purpose.

In the case of the new local organized by an international, the reason for the provisions is evident. The expense of organizing a new local is often borne by the international through funds which all the members of the international have contributed. Naturally, after the local is formed and has built up its own treasury, all the members of the international have a legitimate monetary interest in keeping the local, its members, and its funds in the international.

In addition to monetary considerations there is also necessity for stability within international unions. Modern unionism is largely and necessarily based on organization as widespread as the industry in which the particular union functions. An international and its constituent locals are nothing less than a system of private representative government for the performance of a very delicate and important function in the economy (see Isaacson, The Local Union and the International, 3 N. Y. U. Conference on Labor 493, 494). They exist for the benefit of the worker members. If the international is to perform its function adequately, the right of the local to secede may be qualified even though the parochial interests of its own members might be served, momentarily, by disaffiliation (see, e.g., *Suffridge* v. *O'Grady,* 22 Misc 2d 453 [Spec. Term, N. Y. County]). Hence, it cannot be held that such provisions are demonstrably contrary to public policy.

Nor is it significant that, after the secession of Local 333 and its affiliation with UMW, a "Local 333-ILA" continued to exist within ILA, but only as a "paper local". Of course, once the disaffiliation was effected, most of the 419 members of the Local who voted against secession had little choice but to go along with the majority. More important, however, is the fact that the international and all of its remaining members, as distinguished from the "paper local" and its "members", may have had a legitimate interest in the Local and in the funds in its treasury.

The second ground urged for denying relief to ILA rests primarily upon the fact, conceded for purposes of the appeal,

that Bradley consented to the disaffiliation. There was no proof, and there is no concession, however, that Bradley consented to a disaffiliation other than pursuant to the provisions of the ILA constitution. Nor is there basis for concluding that Bradley had authority to waive the provisions of the ILA or the Local constitutions.

Bradley's enumerated powers as president of ILA were broad. He had omnibus authority to " perform such other and further duties as are usual to this office, and as are performed by the President in accordance with the usages of the I. L. A." It was also the custom for the president of ILA to invoke his powers to the fullest extent.

Policy considerations, as well as traditional concepts, strongly suggest, however, that the power to waive the express provisions of an international's constitution, at least with respect to such matters as disaffiliation and the disposition of assets held by a local, should not be implied (see *Davis* v. *Young*, 9 Misc 2d 209 [App. Term, 1st Dept]; Dangel and Shriber, Labor Unions, § 103; cf. *Martin* v. *Curran*, 303 N. Y. 276, 280; *Wagner* v. *Nichols*, 5 A D 2d 191, motion for leave to appeal denied 5 N Y 2d 706; *Schoeller* v. *Grand Lodge*, 110 App. Div. 456, 460–461; see, also, 8 Fletcher's Cyclopedia Corporations [Perm. ed.], § 4200). Especially is this so where ILA's constitution, in dealing with affiliation of local unions, while giving the executive officers power to make special arrangements regarding the local's property, requires the consent of the executive council of ILA. Moreover, on no view was Bradley or any other officer the proprietor of the international to do with its structure as he wished. Hence, the purported consent by Bradley is to no avail.

In the absence of consent by ILA to the secession, Local 333 is relegated to the defense of laches. This defense is available only to a party who has been prejudiced (*Weiss* v. *Mayflower Doughnut Corp.*, 1 N Y 2d 310, 318; *Marcus* v. *Village of Mamaroneck*, 283 N. Y. 325, 331–332; 2 Pomeroy's Equity Jurisprudence [5th ed.], § 419d). UMW may have been prejudiced by the delay. It was financing ILA, and had there been action by ILA, it might have withheld such financing. There was no proof, however, that Local 333 was prejudiced. Seven months after its secession from ILA, it left UMW and is now securely lodged in the AFL-CIO. Thus, even if it were found that the Local was not put on notice of ILA's objection, and that the delay on the part of ILA in commencing suit was inexcusable, laches would still not constitute a valid defense.

The Local argues, although the trial court did not rest upon it, that the trial decision may be upheld under the "implied condition" or "frustration of purpose" doctrine. Under that doctrine, continuance of affiliation 'between ILA and the AFL would be deemed a condition of the Local's obligation to comply with constitutional provisions limiting its right to secede from ILA. This doctrine will not suffice.

Unlike the cases in which the doctrine has been applied, later discussed, ILA's constitution provided that the assets held by the Local were the property of ILA and received by the Local as trustee for the benefit of ILA. If this were a valid description of the property in such assets, no implied condition or frustration of purpose doctrine would effect a transfer of assets to the Local. Thus, assuming that the literal language of the ILA constitution is controlling and is truly descriptive of the relationship with the Local, then ILA is the "beneficial owner" of the assets held by the Local. It would hardly follow that because ILA was guilty of breach of an implied condition or frustration in the contractual relation (viz., by disaffiliation from the federation) its "beneficial ownership" in the assets held by the Local would be forfeited and vest in the Local. In our jurisprudence neither breach of contract nor breach of trust works, as such, a penal forfeiture of the breacher's property, let alone the beneficiary's property (Restatement, Contracts, §§ 326, 347; Restatement, Trusts 2d, §§ 197–199).

While none of the grounds relied upon for dismissing the complaint are sustainable, it by no means follows that ILA must prevail in this action.

The disposition of assets held by disaffiliating locals has been a troublesome problem in the courts. In solving the problem the courts have successively struck off in new directions as different grounds for disaffiliation have arisen. For obvious and proper reasons the courts have sought to apply traditional legal categories in resolving the difficulties. Yet the recurring problem of the disaffiliating local union presses anew for re-evaluation. Thus, one commentator has aptly said: "The orthodox contract theory does not meet this problem squarely. None of the numerous exceptions to the theory that have developed seems to do so either, and all seem to lack a universal approach that is subject to application in all situations likely to arise". (Greenberg, Disposition of Union Assets upon Disaffiliation, 33 Temple L. Q. 152, 164.) (See, also, to the same effect: Ann.: Local Union—Effect of Withdrawal, 23 A. L. R. 2d 1209, 1214, *supra*; Isaacson, The Local and the International, 5 N. Y. U.

Conference on Labor 413, 423; Cohn, The International and the Local Union, 11 N. Y. U. Conference on Labor 7, 33–34.)

The precedents, while they occasion some difficulty, provide rich evidence of progressive development, and, most importantly, a key to solution.

In early cases involving labor unions, the courts turned to precedents associated with fraternal societies (see, e.g., *Order United Amer. Mechanics* v. *Emery,* 219 Pa. 461). Under such precedents, the constitutions, by-laws and charters were treated simply as contracts among the local members, and between the local union and the international union (*Alexion* v. *Hollingsworth,* 289 N. Y. 91, 97; *Polin* v. *Kaplan,* 257 N. Y. 277, 281; *Brownfield* v. *Simon,* 94 Misc. 720, 726, affd. 174 App. Div. 872, affd. 225 N. Y. 643; *Hogan* v. *Williams,* 185 Misc. 338, 341, affd. 270 App. Div. 789; *Overton-Bey* v. *Jacobs,* 22 Misc 2d 465 [Sup. Ct., Kings County], involving ILA and the same expulsion from the AFL for corruption; *Feller* v. *Egelhofer,* 22 Misc 2d 445 [Sup. Ct., Kings County]; *Harker* v. *McKissock,* 7 N. J. 323, 327–329, *supra;* cf. *De Mille* v. *American Federation of Radio Artists,* 31 Cal. 2d 139, cert. denied 333 U. S. 876).

As intolerable difficulties arose with this "orthodox" approach, if simplistically applied, there was evolved the so-called "implied condition" or "frustration of purpose" doctrine. Under this doctrine, the continuance of the affiliation between the international and the federation is deemed a condition of the obligation of the local to comply with constitutional provisions limiting its right to secede from the international (*Clark* v. *Fitzgerald,* 197 Misc. 355 [EDER, J.], the leading and progenitor case for the doctrine; cf. *Overton-Bey* v. *Jacobs,* 22 Misc 2d 465, *supra; Fitzgerald* v. *Riverside Labor Hall,* 19 CCH Labor Cases 79,162 [Sup. Ct., Erie County], appeal dismissed 6 A D 2d 758, 760; *King* v. *American Bakery & Confectionery Workers' Union,* 34 CCH Labor Cases 96,294 [Cal. Super. Ct.]; *Olson* v. *Carbonara,* 21 Ill. App. 2d 69; *Local 1140* v. *United Elec., Radio & Mach. Workers,* 232 Minn. 217; *Kralstein* v. *Sorchinski,* 34 CCH Labor Cases 96,513 [N. J. Super. Ct.]; *Duris* v. *Iozzi,* 6 N. J. Super. 530; *Bozeman* v. *Fitzmaurice,* 107 N. E. 2d 627 [Ohio Ct. App.]; *American Bakery Workers, Local 253* v. *Russelburg,* 37 CCH Labor Cases 66,837 [Ohio Ct. of Common Pleas]; *Alvino* v. *Carraccio,* 36 CCH Labor Cases 65,210 [Pa. Ct. of Common Pleas]; *Bakery & Confectionery Workers, Local 205* v. *Milwaukee Bakery Employers Labor Relations Council,* 34 CCH Labor Cases 96,692 [Wis. Cir. Ct.]).

Notably, in every one of the implied condition cases, widespread corruption or subversion was the ground for expulsion of the international from the federation. In some of the cases the court rested its holding solely on the disaffiliation of the international from the federation; in others it was held that the disaffiliation and the corruption or subversion justified secession by the local and retention of assets held by the local. The most striking cases are those in New Jersey, in light of the holding and the *ratio decidendi* in the Supreme Court of that State in *Kidde & Co.* v. *United Elec., Radio & Mach. Workers* (7 N. J. 528, *supra*) and in *Harker* v. *McKissock* (7 N. J. 323, *supra*). Thus, see the analysis of the diverging lines of authority in *Edwards* v. *Leopoldi* (20 N. J. Super. 43, cert. denied 10 N. J. 347).

But even in other contexts, where the implied condition doctrine was not or could not be applied, the inadequacy of the naked " contract " approach became evident soon enough. So, in cases where the evidence showed that the local was more than a dues collecting agency for the international, and actually a self-sufficient organization, the local is regarded as an autonomous unit and under the " contract " entitled to the funds (*Crawford* v. *Newman,* 13 Misc 2d 198, 200, affd. 8 A D 2d 789, appeal pending; *Zander* v. *Laveglia,* 26 CCH Labor Cases 86,567 [Sup. Ct., N. Y. County]; cf. *Fitzgerald* v. *Abramson,* 89 F. Supp. 504, 510–511 [RIFKIND, J., So. Dist. N. Y.]; *Vilella* v. *McGrath,* 136 Conn. 645, 650; *International Union* v. *Becherer,* 142 N. J. Eq. 561, 566–568, affd. 4 N. J. Super. 456, cert. denied 3 N. J. 374).

Similarly, if the local itself has created the funds for a special purpose, such as the health and welfare of its own members, the funds are deemed not to fall within the provisions of the internal constitutions requiring that they be turned over to the international (*Order United Amer. Mechanics* v. *Emery,* 219 Pa. 461, 466–467, *supra*; see Rights to Local Union Property after Secession, 58 Yale L. J. 1171, 1173–1174; Greenberg, *op. cit.,* 33 Temple L. Q. 152, 156).

In the effort to alleviate the application of strict contract law, and because it was recognized that the relationship is also a fiduciary one, the courts have also leaned heavily upon doctrines developed on the equity side. The international has been denied relief under the doctrine of " unclean hands " (e.g., *Crawford* v. *Newman,* 13 Misc 2d 198, 202, affd. 8 A D 2d 789, *supra*; *Fitzgerald* v. *Riverside Labor Hall,* 19 CCH Labor Cases 79,162, appeal dismissed 6 A D 2d 758, 760, *supra*).

Property accumulated from member contributions has been deemed to be held in trust by the officers for the members (*UAW* v. *Wells Mfg. Co.*, 20 CCH Labor Cases 80,355 [Wis. Cir. Ct.]; *International Union* v. *Becherer*, 142 N. J. Eq. 561, affd. 4 N. J. Super. 456, cert. denied 3 N. J. 374, *supra*; see Disposition of Union Assets on Disaffiliation, 45 Va. L. Rev. 244, 252–254, 259–260).

Finally, at least one court has adopted the approach that the certification by the NLRB under the Federal statutes is the dominant factor in determining the proper disposition of funds held by a disaffiliating local (*Huntsman* v. *McGovern*, 91 N. E. 2d 717 [Ohio Ct. of Common Pleas]; but, see, *Bozeman* v. *Fitzmaurice*, 107 N. E. 2d 627 [Ohio Ct. App.], *supra*). This — upon the ground that the representation of its members in the collective bargaining process is the major function of a union.

As the development of the precedents has been examined there is evident growing recognition of the large and unique role played by the labor union — one not cognizable within the frame of written constitutions interpreted as simple contracts. The reason is an obvious one.

The labor union, in its stratification into local unions, internationals and federations, is a much more complicated structure than that usually found among other types of unincorporated associations. Moreover, it has a vital social purpose — the collective regulation and manipulation of the most significant material relationship of the workers in the economy. Among these several layers of organization the internal constitutions create extensive schemes of private government and purport to dispose of various contract and property rights among the constituent elements. The overriding and expressed purpose is that of advancing the welfare of the worker members, either in the provision of welfare benefits, or in conducting negotiations in collective bargaining, or for the purpose of waging economic war. Thus viewed, insulating language, expressed in terms of simple contract or property law, in the constitutions of the unions offers neither a proper description of the facts nor an effective obstacle to achieving the best interests of the ultimate beneficiaries.

As the precedents are further examined a dominant thread is evident. In each case the court searches for the seat of the beneficial interest and how that interest may be best served. In this search, the court has never been limited by the descriptions of legal title to assets or property contained in the internal

constitutions, any more than it has been limited in finding or executing a trust in the documents in which a fiduciary obligation is found.

Moreover, and the point is more often missed than recognized, title to assets held by an unincorporated association is not vested in the "entity". The association has no capacity to receive or hold title. Instead, title is vested in the form of undivided interests in the members. (7 C. J. S., Associations, § 14; Isaacson, *op. cit.*, 3 N. Y. U. Conference on Labor 493, 504.)

It is not only the courts which have concluded that labor organizations are infused with a fiduciary obligation. In 1959 the Legislature enacted a comprehensive statute — the Labor and Management Improper Practices Act (L. 1959, ch. 451; Labor Law, § 720 *et seq.*) — which expresses and rests upon the fiduciary responsibilities of labor organizations and those of their officers and agents. In addition, implementation is provided for the regulation of such fiduciary obligations. Standards are provided, as well as sanctions, to accomplish the ultimate objective. Indeed, some violations of the statute are made misdemeanors (§ 725, subd. 4; § 728, subd. 2). Some of the very acts for which ILA was expelled by the AFL are embraced within the prohibitions contained in the statute. All of this confirms legislatively what has been evident in the decisional law, namely, that the trade union complex is one governed not so much by simple contract law but by principles which determine entrusted funds and fiduciary obligations.

Section 720 of the new statute contains the legislative findings. It contains, in effect, the finding that the entrusting of funds by members and the collective bargaining obligation reposed in the officers and agents of labor organizations are of a fiduciary nature. While the statute is only prospective in effect as to its operative provisions, the need for such a statute and findings made legislatively relate to a condition subsisting long before the enactment of the statute. Moreover, these findings are quite in consonance with the best decisional law.*

On this analysis, the entire union structure in its several layers is viewed as a fiduciary one. Each layer may retain assets held by it in accordance with the internal constitutional provisions, provided such retention does not violate but rather implements the fiduciary obligation and the trade-union function. On the same reasoning, the beneficial use of the assets is

---

* For a contemporaneous Federal statute of strikingly similar tenor, see, Labor-Management Reporting and Disclosure Act of. 1959 (§ 2, subd. [b]; § 501, subd. [a]; U. S. Code, tit. 29, § 401, subd. [b]; § 501, subd. [a]).

in the worker members, not in the organizational entity which exists solely for their benefit. A general breach of fiduciary obligations, such as widespread corruption or subversion, forfeits the right of the guilty entity to perform its fiduciary role. In that situation, the assets do not "revert" to the wrongdoers, but to the beneficial owners. While all the cases may have not said as much, this is what their decisions do, virtually without exception, if not, indeed, without exception.

There remains, however, a significant caveat. It is not every factional or ideological disruption in the labor organization which will work such a forfeiture (see, e.g., *Grand Lodge* v. *Girard Lodge No. 100*, 384 Pa. 248, *supra*). The disruption must be the result of a condition so widespread and so fundamental as to undermine the fiduciary reason for being and trade-union character of the entity affected. This, indeed, was the language used by the AFL to justify its expulsion of ILA. It is, therefore, organized labor's own reference to the principle with which this case is concerned.

This last discussion uncovers one of the weaknesses in the "implied condition" theory. So, to illustrate, one might assume that the AFL had revoked the ILA charter, not on the ground of corruption, but simply because the AFL craft unions concluded that their own interests would be served by such expulsion. Under such circumstances, Local 333 would hardly be permitted to abandon the ILA, take the funds in its treasury, and profit from the desertion. In the ordinary case, affiliation with a federation is not the true implied condition. The true implied condition is the absence of such corruption, subversion or equally grievous fault in the international as would result in the loss of its trade-union character.

As one note writer has said: "Thus, the context in which forfeiture clauses are invoked will dictate their enforceability. Where disaffiliation results from caprice or internecine conflict, they should be effective. Where expulsion is due to corruption, to permit forfeiture would be to reward dishonesty." (Disposition of Union Assets on Disaffiliation, 45 Va. L. Rev. 244, 260; see, also, *Crawford* v. *Newman*, 37 Tex. L. Rev. 793, 796.)

There remains still another aspect to the problem. Assuming that the beneficial owners of union assets are the worker members and that the international has lost its trade-union character, one must still decide whether the beneficial interest is in the membership of the international or only in the membership of the local union. The answer will be contingent upon what assets are involved, their source, and the purpose for which

they are committed. Also relevant may be such factors as the past relationship between the local and the international with respect to financial matters and the extent to which the local has functioned as an autonomous unit. As noted earlier, the courts have commented upon and also relied upon these factors (e.g., *Crawford* v. *Newman*, 13 Misc 2d 198, 200, affd. 8 A D 2d 789, *supra*; *Fitzgerald* v. *Abramson*, 89 F. Supp. 504, 511, *supra*; *Local 1140* v. *United Elec., Radio & Mach. Workers*, 232 Minn. 217, *supra*; *International Union* v. *Becherer*, 142 N. J. Eq. 561, affd. 4 N. J. Super. 456, cert. denied 3 N. J. 374, *supra*; Ann.: Local Union — Effect of Withdrawal, 23 A. L. R. 2d 1209 *et seq.*, esp. 1213, *supra*; Isaacson, *op. cit.*, 3 N. Y. U. Conference on Labor 493, 514–515).

The relevance of the past relationship between the local and the international is evident if one were to consider, but for a moment, the right of UMW to have obtained the Local's assets when the Local severed its relationship from UMW after only a seven-month affiliation. Assuming that the constitution of UMW were identical with that of ILA with respect to secession and reverter of assets, and even in the absence of corruption, a nice question would be presented whether UMW should be permitted to take the Local's assets.

That there are varying degrees of autonomy between local unions and their internationals and that the members of an autonomous local may have a paramount beneficial interest in funds in its treasury has already been recognized. An unusually experienced and keen observer in this field, in suggesting that the international-local relationship be realistically evaluated, has observed: "The basic unit in the trade union is the local, the individual member's point of contact with the union. It is with the local that all power and revenue originates. * * * The international, the highest body in the trade union movement, is a self-contained and self-governing unit insofar as internal matters are concerned. In the international is gathered the power derived from the constituent locals." And again: "The actual ties between local and international and their respective areas of function and control cannot be discovered by examination of the constitution and by-laws. To secure an accurate picture of their relationship, one must go further and observe the actual day to day handling of union affairs." (Isaacson, *op. cit.*, 3 N. Y. U. Conference on Labor 493, 498, 499.)

So it is, that in a specific situation, the situs of a beneficial interest with respect to assets held by a disaffiliating local may move more or less in the direction of either the membership

at large of the international or that of the local. Realistically viewed, the beneficial interest is not always evenly proratable among all the members of the international. Nor do the constitution and by-laws necessarily locate its situs. And, when erosion of the structured fiduciary relationship occurs, a *pro tanto* retention of entrusted assets by a disaffiliating local may be proper.

While the nature of the relationship between the Local and ILA was not fully developed at the trial, at least for the purposes discussed here, it appears that the Local was, as a practical matter, in most respects an autonomous unit.

Moreover, in this case, there is no dispute that the funds involved were collected from the Local members and were to be used for Local purposes. Quite a different situation would be presented if these funds had been advanced by the international or some third party. So, too, there might be a different situation if the funds had been accumulated as a part of some specially committed international reserve or fund. In such circumstances, it would become critical to determine where the beneficial ownership rested, or would be best served, as between the " loyal " membership of the international, and that of the seceding Local. Moreover, in that case, the perfidy of the international officers would not necessarily " forfeit " the interest of the international membership at large.

Applying the principles last discussed, there is no difficulty in reaching the conclusion that if ILA was guilty of widespread corruption, it forfeited its rights to perform any fiduciary obligation on behalf of Local 333 or its members. It would follow equally well that, the fund in suit having been collected from and solely for the benefit of the Local members, the Local is entitled to retain such fund. But there still remains the question whether the proof in this action established that ILA was guilty of such widespread corruption.

What happened here was that the AFL, by an overwhelming vote of the delegates at its annual convention, adopted the finding of the executive council that ILA was infected with such corruption as to destroy its integrity, its effectiveness, and its trade-union character. The expulsion was purportedly pursuant to the constitution of the AFL after an appearance by representatives of ILA before the AFL's executive council. In other words, under the federation constitution, by which the international was itself bound, it was held to be guilty of such widespread corruption as to have lost its trade-union character.

Thus, given the condition found by the AFL to exist in ILA, there is little difficulty in accepting the validity of the Local's secession or the retention by it of the funds in dispute. There was no direct proof of corruption on the trial. The question is, therefore, narrowed to the issue whether the Local may invoke the AFL's finding against ILA in this action.

On this mixed question of substantive law and evidence, ILA urges that the evidence pertaining to its expulsion by the AFL was admitted at the trial only to show the reasons given by the AFL for the expulsion and not as proof of the underlying fact of the corruption itself. ILA also urges that the AFL's finding was made solely on the basis of newspaper articles and testimony developed in ex parte hearings conducted by the State Crime Commission. Finally, ILA contends that the AFL finding was an extrajudicial one and, as such, is not binding on it in this action.

The ILA's contention that the evidence pertaining to its expulsion was admitted solely to show the reasons given by the AFL for expulsion is supported by the record. Its assertion that the AFL's finding is based solely on newspaper articles and the hearings conducted by the State Crime Commission is not entirely correct.

The AFL executive council utilized the testimony given at the Crime Commission hearings as the basis for its charges against ILA. ILA replied that it was taking effective steps to eliminate the condemned conditions and requested a hearing in the event the executive council concluded that any significant factual issues were in dispute. Later, a hearing was held. Bradley testified that the hearing was concerned with jurisdictional problems which ILA had with several AFL craft unions. The report of the executive council, however, shows that the council found that there was no denial of the charges, but merely a plea for more time. It was further concluded that eight months had elapsed since ILA had been called upon to cleanse its organization and that ILA had failed to do so.

On these facts, it may not be found that either the expulsion or the AFL finding of corruption is invalid, as an internal matter governed by the union constitution. True, the proceedings of the State Crime Commission, as such, would not be admissible in this action as proof of the facts contained therein (*United States* v. *International Harvester Co.*, 274 U. S. 693, 703; cf. *People* v. *Stilwell*, 244 N. Y. 196, 200–201). But the executive council of the AFL would not be so limited by the hearsay rule (cf. *Madden* v. *Atkins*, 4 A D 2d 1, 12, mod. 4 N Y 2d 283; *Allen* v. *Los Angeles County Dist. Council of Carpen-*

*ters,* 51 Cal. 2d 805, 810–813; Ann.: Labor Union Member — Discipline, 21 A. L. R. 2d 1397, 1437–1445). Moreover, in view of the position taken by ILA with respect to the AFL's charges, the council was hardly required to take formal proof at the hearing.

Concluding, as one should on this record, that the AFL's finding of generalized corruption is valid, as an internal matter, one turns directly to how the finding may be invoked by the Local against ILA in this action.

The question is not one of first impression. It was directly raised in *Crawford* v. *Newman* (13 Misc 2d 198, affd. 8 A D 2d 789, *supra*). There, a verdict and finding of corruption made by the AFL-CIO Ethical Practices Committee against the Bakers International was received in evidence. The trial court concluded that the international was corrupt, without additional proof, and this court, without opinion, affirmed the judgment in favor of the seceding Local.

This is a clear holding, but the matter may be explored further.

Ordinarily, extrajudicial findings are inadmissible, either as hearsay or as conclusions by incompetent tribunals. However, in this case one is not dealing with an extrajudicial finding which is being offered and received as a substitute for a judicial finding.

On the contrary, the AFL expulsion for corruption is an operative fact which, under the interlinking constitutions of the federation, international, and local union, is an event binding on all, at least, prima facie, pursuant to those very constitutions. The mutual agreement makes the tribunal and the finding competent for purpose of the agreement. On the other hand, the finding of widespread corruption by the Crime Commission, governmental body though it be, by itself, has no such binding effect and no probative value, because ex parte and extrajudicial. At least that is true for the purposes of this case, however persuasive it might be as a matter of public impact.

Of course, one need not conclude that the AFL's finding is absolutely conclusive against the ILA in this action. The expulsion on the particular finding, however, is binding until upset in a proper forum, either internal or the courts. To upset that fact would mean more than showing it was not well based, but that it was void or voidable for fraud, corruption, or other condition undermining its vitality. Thus, ILA must establish an infirmity in the finding itself (*Nilan* v. *Colleran,* 283 N. Y. 84, 91; *Polin* v. *Kaplan,* 257 N. Y. 277, 282, *supra*; see

Di Maio, Expulsion, Unions and the Courts, 4 N. Y. U. Conference on Labor 377 and the cases cited; Summers, Union Democracy and Union Discipline, 5 N. Y. U. Conference on Labor 443, 459–474 and the cases cited).

Thus analyzed, the burden of proof of establishing widespread corruption was on the Local. That burden, however, was met by proof of the expulsion of ILA on that ground. If the effect of the expulsion was to be avoided, the burden of going forward was on ILA.

On the foregoing, there is sufficient in the record to justify the Local's secession and retention of assets. However, as ILA urges, the evidence relating to its expulsion was admitted at the trial only as proof of the reasons given by the AFL for the expulsion, in order to establish breach of the implied condition to retain membership in the AFL, and not as proof of the corruption itself. Nor was the proof offered to establish the broader ground suggested here, namely, erosion of the trade-union character of the international. ILA was entitled to rely on the trial rulings, and hence there was no occasion for it to attack the AFL finding on the trial. On a new trial, however, at which the issues would be considerably narrowed, the ILA might be able to prove an infirmity. It would be unfair on the appeal to foreclose this possibility (see *Ward* v. *Hasbrouck*, 169 N. Y. 407, 420; *Rentways, Inc.,* v. *O'Neill Milk & Cream Co.,* 308 N. Y. 342, 349; 9 Carmody-Wait, New York Practice, pp. 24–25).

Moreover, on any view of the case, since this court's holding and reasoning departs sufficiently from the issues as the parties treated them, elementary principles of fairness dictate the need for a new trial (see *Wells* v. *Fisher,* 237 N. Y. 79, 84). At no time was ILA put on notice by the pleading or at the trial that its right to a reverter of the assets held by the Local depended upon its being free of an intra-union determination that it had lost its trade-union character for widespread corruption.

Accordingly, the judgment should be reversed, on the facts and the law, and a new trial granted, with costs to abide the event.

Botein, P. J., Stevens and Bergan, JJ., concur; M. M. Frank, J., deceased.

Judgment reversed on the law and on the facts, and a new trial ordered, with costs to abide the event.