[No. 39454.    En Banc.    June 6, 1968.]

INTERNATIONAL BROTHERHOOD OF PULP, SULPHITE AND PAPER MILL WORKERS, AFL-CIO *et al., Appellants,* v. FRED DELANEY *et al., Respondents.**

*Bassett, Donaldson & Hafer,* by *Hugh Hafer,* for appellants.

*Dysart, Moore & Tiller, Lloyd B. Dysart, Willner, Bennett & Leonard,* and *Don S. Willner,* for respondents.

*Reported in 442 P.2d 250.

ROSELLINI, J.—In this suit by an international union to obtain the funds and other property of one of its local affiliates, the following findings of fact were entered:

I

Plaintiff, International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL-CIO (hereinafter called International) is an International Union with a membership of about 175,000 throughout the United States and Canada. Its Constitution provides among other things: —

Article I,

"The object of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers shall be to secure and maintain a living wage and to lessen the hours of labor for its members; to assist each other in obtaining employment in preference to persons not connected with this Union; to use every honorable method to elevate its membership in the economic, moral and social scale of life; to help safe-guard the principles of democracy; to work for the establishment of political and social equality regardless of race, color or creed, and to promote friendly relations between labor and industry and labor and government."

Article XII, Section 4,

"If a local union fails to keep within the laws of the International Union and is suspended; or if a local union is disbanded because of the shutting down of an operation; or for any other cause, all books, moneys, and properties of the local union shall become the property of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers. The executive board shall take proper legal steps against any local union officers or members failing to comply with this provision."

II

Defendants, Delaney, Claypool, Johnson, Emerson, Hill, Skare, Beebe and Dingman, when this suit was filed were pulp and paper mill workers employed by the Longview Fibre Company in Longview, Washington and were officers of Local 153.

III

Defendant International 153 (hereinafter called Local 153) was affiliated with the International from 1934 until

May 26, 1964, when at a membership meeting by unanimous vote the members voted to disaffiliate from International, and affiliated with the new Association of Western Pulp and Paper Workers (hereinafter called Western) which Local 153 had helped to form and to retain the local's assets in its new affiliation.

## IV

The assets of Local 153 on that date were $34,217.32 and a Local Union Hall and furnishing[s] valued at $70,780.07.

## V

Local 153 paid its per capita tax to International and in all respects conformed to the Constitution of International and fulfilled all the obligations placed upon it by said Constitution up through the date of disaffiliation.

## VI

All of the assets of Local 153 on the day of disaffiliation were contributed by the members of Local 153 from membership dues which were fixed by the local membership, except that in 1957 International donated $1,500.00 and a sign for the union hall of the value of $400.00.

## VII

The funds for building the Union Hall came from special assessments voluntarily imposed by the membership of Local 153 upon themselves and were at all times segregated from the assets of the Local and this segregation of the building funds was approved by International.

## VIII

Local 153 was not suspended nor did it disband.

## IX

On October 1, 1964, Western won a National Labor Relations Board election and became the collective bargaining agent for 21,000 mill workers in the West Coast including the members of Local 153.

There follow findings that one of the officers of the International was probably guilty of corrupt practices, that the International made only a cursory investigation when charges were made against him and thereafter exonerated

him; that attempts of the defendant locals to effect reforms in the union procedures were frustrated, and that the International refused to allow the local to participate in bargaining procedures, apparently because of these attempts. The remaining findings are:

## XXIII

On May 26, 1964, International demanded that Local 153 turn its books and records over to the CPA firm that had been hired to assist the counsel for International. When Local 153 refused to do so, International ordered Local 153 placed in trusteeship on July 9, 1964 and the trusteeship has continued to this date.

## XXIV

Local 580 which consists of the pulp division employees of Weyerhaeuser Timber Company in Longview, Washington, disaffiliated from International and affiliated with Western on September 26, 1964. The books and records of Local 580 are in the possession of the local in its new affiliation and are being used by the local to carry on its collective bargaining function.

Upon these findings, the trial court concluded that the purpose of the contract between the locals and the International had been frustrated, that the International was guilty of a breach of its fiduciary duty to the locals, and that it came into court with unclean hands. The International's claim that it had a right to the funds and property of the local was denied and its action was dismissed.

After this case was appealed, the National Labor Relations Board conducted an election among the workers in the pulp and paper industry on the West coast, as a result of which the Association of Western Pulp and Paper Workers (hereinafter referred to as Western) retained its status as bargaining agent by a substantial majority vote.

The first contention of the International is that a judgment of the Circuit Court of the State of Oregon for the County of Multnomah, in cases Nos. 302-117 and 302-118 entitled *Phillips and Burnell v. Perrin*, determined that the International is entitled to exercise its rights under the forfeiture clause and is res judicata. That suit was brought

by the International against Western and the Uniform Labor Agreement Committee (hereinafter referred to as ULA) to recover $160,000 which it was alleged the unions had paid to the ULA to finance the campaign to supplant the International as exclusive bargaining agent on the West coast, through a National Labor Relations Board election. Actually, we believe the doctrine which the International has in mind is that of collateral estoppel, since it is not the entire cause which they claim is res judicata. *See Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 429 P.2d 207 (1967). If it were, we assume the appellants would have sued on the judgment, rather than bring an independent action.

The International successfully resisted a motion to join the local union as a defendant in that action, on the ground that it was not a proper or necessary party. It is not suggested that the other defendants as individuals were represented in that action. The funds which were the subject of that litigation are not the funds which the International is seeking to recover in this action, and the theory of recovery is different. In addition, the International seeks title to a building which was not involved in that litigation. Nevertheless, the International argues that the judgment of the Multnomah County court, in its favor, is res judicata because the same defenses were raised and the evidence was largely the same.

■ The doctrines of res judicata and collateral estoppel do not apply where the issues and parties are not the same. We need not decide whether the Oregon judgment would estop the defendants on any issue in this action had they been represented in that action. Suffice it to say that the International cannot be heard to claim that the defendants were represented in that action, when the International itself objected to the local's being made a party to that action and successfully excluded it.

■ The purpose of collateral estoppel by judgment is to preclude parties or their privies from relitigating an issue that has been finally determined by a court of competent jurisdiction, after the party against whom estoppel is

claimed has had an opportunity to fairly and fully present his case. *Henderson v. Bardahl Int'l Corp.*, 72 Wn.2d 109, 431 P.2d 961 (1967). Since the defendants were not parties to the Oregon action, the doctrine does not preclude them from contending that the forfeiture clause should not be enforced.[1]

The only findings to which error is assigned are findings XI, XII and XIII (not quoted in this opinion), and these are not set forth in the appellant's brief as required by Rule on Appeal 43. Furthermore, the argument in support of the assignments is not so much that there was no evidence to support the findings (insofar as they were findings and not conclusions), as it is that the conduct described in them did not justify a conclusion that the International was so corrupt as to vitiate its right to impose the obligations of its constitution on the local.

Since we have reached the conclusion that the constitution of the International does not provide for a forfeiture of the funds of a local under the circumstances of this case, we need not decide whether the International is correct in its assertion that its conduct was not such as to vitiate the contract and will assume that it is correct in this assertion.

The International relies upon the case of *Bowman v. Moe*, 66 Wn.2d 629, 404 P.2d 437 (1965), holding that the contractual provisions between a local union and an international union are not void as against public policy where they provide for the reversion of the local union's treasury

---

[1]It is of interest that the International has brought 42 actions on the West coast against different locals, as well as the action against Western and the ULA. In another Oregon action against a local, the trial court refused to enforce the forfeiture clause and held that the defendants in that action were not estopped by the judgment in the Multnomah County action. Both of these Oregon judgments have been appealed and were heard together by the Oregon Supreme Court. In another of the actions, Bouse v. Burns, et al., Clackamas County, Oregon, Cause No. 60478, the trial court likewise refused to decree forfeiture of a local union's funds. There is no more reason why this court should follow the decision of the Multnomah County trial court on this issue than there is that it should follow the contrary decision reached by two different Oregon trial courts.

*funds* to the international union upon dissolution of the local.

The local union in that case did not agree unanimously to disaffiliate, rather, 13 members voted to remain with the international. Also, it was not proposed to take the funds with the local into the new affiliation. Instead, the membership voted to distribute the funds among the members. When the majority of the members voted at an NLRB election to certify another International as bargaining agent, the parent revoked the charter of the local, although it still had loyal members. We followed the rule which we laid down in *Grand Court of Washington, Foresters of America v. Hodel,* 74 Wash. 314, 133 Pac. 438, 47 L.R.A. (n.s.) 927 (1913), that no number of the members of an order less than the whole can divert the funds to uses other than the uses defined in the constitution and laws of the order.

In the case before us, the vote to disaffiliate was unanimous, and there is no contention that the funds will, if left in the hands of the local, be used for purposes other than those for which they were intended when they were contributed. Contrary to the theory of the International, *Bowman v. Moe, supra,* is not determinative of the issue presented here, and in fact it recognizes, at least by implication, that a local, acting unanimously, can withdraw from a parent organization and take its funds and other property with it.

In the case of *L&SW, Local 2623 v. IWA, Local 49,* 197 Wash. 491, 85 P.2d 1099 (1938), this court held that the constitution of an unincorporated labor association and the charter issued pursuant thereto constitute a contract between the members of the union. In that case the great majority of the members of a local had voted to withdraw from the international and had affiliated with another union, but at least 10 members had remained loyal to the international. Under the constitutional provisions, the money and property of the local union could not be divided among the members individually but should remain the

property of the local so long as 10 members remained therein. This court rejected the theory of the disaffiliating members'that, since they were the majority, they were in fact the local union and that this union did not lose its identity merely because it transferred its affiliation.

In a strong dissent written by Beals, J., it was pointed out that this court had previously held, in *Shipwrights Local 2 v. Mitchell,* 60 Wash. 529, 111 Pac. 780 (1910), that the identity of an unincorporated labor association and its property rights are not affected by changes in its affiliations with other labor unions or organizations.

The companion cases of *Local 2508, L&SW v. Cairns,* 197 Wash. 476, 85 P.2d 1109 (1938) and *Local 2618, Plywood & Veneer Workers v. Taylor,* 197 Wash. 515, 85 P.2d 1116 (1938), also employed the contract theory in determining the ownership of funds of locals upon their dissolution.

In *Labonite v. Cannery Workers Local 18257,* 197 Wash. 543, 86 P.2d 189 (1938), it was held (as in the *Shipwright* case, cited in the dissent to the *L&SW Local 2508* case, *supra*) that where the entire membership of a local changes its affiliation, the union remains the same. (*See also Kanzler v. Linoleum Workers Local 1303,* 20 Wn.2d 718, 149 P.2d 276 (1944).) In that opinion, it is stated that the local union kept its property when it changed its affiliation. It was held that the local remained bound under contracts to obtain employment for the workers represented in the action.

*L&SW Local 2623 v. IWA Local 49, supra,* and its companion cases do not control the question presented here, inasmuch as the disaffiliations there involved were not effected by the entire memberships of the locals. The basic holding of these cases is that the secession of a majority of the members of a local union does not work a dissolution of that union, so long as the number of members remaining therein equals or exceeds the number required by the organic law of the parent body to constitute a local union. *See Kanzler v. Linoleum Workers Local 1303, supra.*

Rather, the *Labonite* case, *supra,* holding that the disaf-

filiation of an entire membership does not work a dissolution of the local and recognizing, by necessary implication, the right of the entire membership to retain its property when it disaffiliates from one parent organization and affiliates with another, is more in point, since the transfer of affiliation in this case was by the act of the entire membership. We say that the implied recognition of the right to retain property in such a case was necessary to the decision in the *Labonite* case for this reason: The holding of the case was that the union retained its identity and remained bound under its contracts. It would be anomalous to impose such a duty on a local union which had lost its right to retain its property and funds, since it would then have no assets with which to respond in damages in a suit for breach.

The contract theory which this court adopted in *Cox v. United Bhd. of Carpenters,* 190 Wash. 511, 69 P.2d 148 (1937), and applied in the *L&SW Local 2623* case, *supra,* and its companion cases,[2] has been criticized as inappropriate to resolve questions arising between an international labor union and its member locals.[3] It has been observed that there is no true bargaining power on the part of the local, if the international is powerful and is the only body through which it can bargain with the employer effectively. In other words, a group of workers who have organized a local association and desire to affiliate with a national or international association of locals, or who simply seek to be organized as a local by the national or international body, cannot sit down at the bargaining table and negotiate the

---

[2] Another case employing this theory, but not involving a question of the ownership of property, is *Retail Clerks Local 381 v. Westling,* 41 Wn.2d 90, 247 P.2d 253 (1952).

[3] Note: *The Legal Consequences of Labor Union Schisms,* 63 Harv. L. Rev. 1413 (1950); C. Summers, *Union Schism in Perspective: Flexible Doctrines, Double Standards and Projected Answers,* 45 Va. L. Rev. 261 (1959); Note: *Disposition of Union Assets on Disaffiliation,* 45 Va. L. Rev. 244, (1959); H. Fisher, *Effects of a Union Split Upon Property Rights,* 1952 Wis. L. Rev. 139; and see an excellent symposium discussion of many of the problems mentioned herein in 22 Ohio St. L.J. (Winter, 1961).

terms under which they will affiliate with the parent body. At least this is true as a general rule, and it has not been suggested to the court that the local could have obtained a modification of any provision in the constitution of the International when it sought membership.

Also, it is unrealistic to suppose that union members are aware of all the provisions of an international's constitution when they become affiliated with it. There is, then, no actual mutual assent, and there is no equal or even comparable bargaining power. If workers are to obtain the advantages of collective bargaining, they must belong to the labor organization which is the certified bargaining agent in the particular industry. Their ability to negotiate the terms of their affiliation is very limited. The bargaining power is unevenly balanced in favor of the parent organization.

These criticisms have been expressly rejected by some courts. *See*, for example, *Edwards v. Leopoldi*, 15 N.J. Super. 466, 83 A.2d 551 (1951), *rev'g* 20 N.J. Super. 43, 89 A.2d 264 (1952) and *Harker v. McKissock*, 7 N.J. 323, 81 A.2d 480 (1951).

Although the principles of contract law can only be applied with some awkwardness in disputes between labor union locals and parent organizations, the fact is that the relationship is consensual, and presumably the provisions of the constitutions of such organizations are designed to strengthen the solidarity and accordingly the bargaining position of the component locals and effectuate the union purposes. It is therefore not unjust to enforce these provisions between the parties, at least where they are not clearly oppressive and unreasonable. But where an international seeks to enforce a forfeiture provision only as an exploitative or punitive measure and cannot show that the funds could be used for the benefit of the local were it to be reinstated, while on the other hand the local has retained its autonomy and can and will use the funds for their intended purpose if it is allowed to retain them, there appears no sound reason why the courts should aid the international by enforcing the forfeiture provision.

In the case of *Bradley v. O'Hare,* 11 App. Div. 2d 15, 202 N.Y.S.2d 141, 153-54 (1960), cited by this court with approval in *Bowman v. Moe,* 66 Wn.2d 629, 404 P.2d 437 (1965), and relied upon by the appellants, the opinion by Breitel, J., discusses the various theories that have been advanced in deciding these cases. It recognizes that there is a growing understanding of the "large and unique role played" by labor organizations and that the concept of simple contract can no longer apply to all of the ramifications involved. In the words of the opinion:

The labor union, in its stratification into local unions, internationals and federations, is a much more complicated structure than that usually found among other types of unincorporated associations. Moreover, it has a vital social purpose—the collective regulation and manipulation of the most significant material relationship of the workers in the economy. Among these several layers of organization the internal constitutions create extensive schemes of private government and purport to dispose of various contract and property rights among the constituent elements. The overriding and expressed purpose is that of advancing the welfare of the worker members, either in the provision of welfare benefits, or in conducting negotiations in collective bargaining, or for the purpose of waging economic war. Thus viewed, insulating language, expressed in terms of simple contract or property law, in the constitutions of the unions offers neither a proper description of the facts nor an effective obstacle to achieving the best interests of the ultimate beneficiaries.

As the precedents are further examined a dominant thread is evident. In each case the court searches for the seat of the beneficial interest and how that interest may be best served. In this search, the court has never been limited by the descriptions of legal title to assets or property contained in the internal constitutions, any more than it has been limited in finding or executing a trust in the documents in which a fiduciary obligation is found.

. . . .

On this analysis, the entire union structure in its several layers is viewed as a fiduciary one. Each layer may retain assets held by it in accordance with the internal constitutional provisions, provided such retention does not violate but rather implements the fiduciary obligation

and the trade-union function. On the same reasoning, the beneficial use of the assets is in the worker members, not in the organizational entity which exists solely for their benefit. A general breach of fiduciary obligations, such as widespread corruption or subversion, forfeits the right of the guilty entity to perform its fiduciary role. In that situation, the assets do not "revert" to the wrongdoers, but to the beneficial owners.

Courts which have applied the "frustration of purpose" doctrine, adopted by the trial court in this action, have cited the rule that, where the continued existence of a state of facts is an implied condition going to the essence of a contract, the destruction of the state of facts puts an end to the contract itself. *Duris v. Iozzi*, 6 N.J. Super. 530, 70 A.2d 793 (1949), is an example. In that case, and in *Olson v. Carbonara*, 21 Ill. App. 2d 69, 157 N.E.2d 273 (1959); *Bozeman v. Fitzmaurice*, 62 Ohio L. Abs. 526, 107 N.E.2d 627 (1951); *Crocker v. Weil*, 227 Ore. 260, 361 P.2d 1014 (1961); and *Local 1140 v. United Elec. Radio & Mach. Workers*, 232 Minn. 217, 45 N.W.2d 408, 23 A.L.R. 1197 (1950), it was found that continued affiliation of the parent with the CIO was an implied condition of the contract, and when the parent was expelled, the local was held entitled to secede and take its assets with it, the contract with the parent being at an end.

In another case, *Local 1, Amalgamated Lithographers v. Brown*, 45 Misc. 2d 109, 256 N.Y.S.2d 66 (1965), *aff'g* 26 App. Div. 2d 90, 270 N.Y.S.2d 891 (1966), it was held that, absent governing constitutional provisions, a local lithographic union could secede from the international, whose constitution referred only to lithographers, upon the international's merger with a photoengravers' union, under the doctrine of frustration of purpose.

In *Bradley v. O'Hare, supra,* the court said that, if the international union was guilty of widespread corruption, it forfeited its rights to perform any fiduciary obligation on behalf of the constituent members and could not claim the accumulated dues in the local's treasury when it disaffiliated.

The theory of the breach of an implied condition, the theory that the contract has been frustrated, the doctrine of unclean hands as applied in some of the cases, and the breach of trust theory have been subjected to some criticism,[4] but as the court observed in *Crocker v. Weil, supra,* the cases employing them have refused to enforce forfeiture provisions against the seceding local unions involved, and no one has criticized this result.

In an annotation entitled "Withdrawal of a local labor union or part of its membership from the parent organization or from a general association as affecting property rights," the annotater says:

> It is the opinion of this writer that the general trend of decisions to-day is not to apply the well-established rule against giving funds to a seceding majority when the international constitution prohibits it in those situations in which the parent organization has become incapable of performing the main function for which it exists, namely the enhancement of the bargaining position of the members of the local union. If an international organization loses such a large portion of its membership that it is no longer able to maintain its bargaining position in the industry effectively, then the value of such organization to the members of the locals is substantially destroyed and it is undesirable from a practical point of view to deprive the seceding majority of all their rights in the funds to which they contributed the major portion. 23 A.L.R.2d 1209, 1214 (1952).

In the case before us, the International has unquestionably lost its bargaining power, so far as these locals are concerned, since it is no longer the certified bargaining agent for pulp and paper workers on the West coast. Consequently, whether or not there was corruption in the International so widespread as to destroy its labor union character, or whether or not the locals were justified in seceding because the International had deprived them of their right of representation at the bargaining table, for this reason alone, the "frustration of purpose" doctrine would defeat

---

[4]See the sources cited in n. 3, *supra.*

the claim of the International, should we find it necessary to sustain the trial court's application of that doctrine.

To avoid a forfeiture, some courts have held that funds collected under local direction for purely local purposes are not subject to the provisions of an international's constitution requiring the local to turn its fund over to the international upon withdrawal. See the cases cited in 23 A.L.R.2d 1209 (1952) at 1217. All of the funds and property involved in this litigation fall within this category. However, we do not rest our decision on this ground.

■ The rule is that the relationship between a local and an international is a voluntary one, and in the absence of a contractual agreement to the contrary, the local is free to withdraw from the international at will. *Vilella v. Mc-Grath,* 136 Conn. 645, 74 A.2d 187 (1950); *International Union of United Brewery Workers v. Becherer,* 142 N.J. Eq. 561, 61 A.2d 16, *aff'g* 4 N.J. Super. 456, 67 A.2d 900, *cert. denied* 3 N.J. 374, 70 A.2d 537 (1948); *(see Shipwrights Local 2 v. Mitchell,* 60 Wash. 529, 111 Pac. 780 (1910)).

In the absence of enforceable provisions in the parent union's constitution which prevent disaffiliation of a local union intact with its property, a local union by a majority vote may sever its relationship with the parent union and, taking its property with it, may remain independent or seek a new affiliation. *Local 1140 v. United Elec. Radio & Mach. Workers, supra.*

The findings in this case do not disclose any provision of the International's constitution forbidding a local to withdraw and our attention has not been directed to such a provision. The appellants rest their claim on article XII, section 4, which provides:

> If a local union fails to keep within the laws of the International Union and is suspended; or if a local union is disbanded because of the shutting down of an operation; or for any other cause, all books, moneys, and properties of the local union shall become the property of the International Brotherhood of Pulp, Sulphite and Paper Mill Workers. The executive Board shall take proper

legal steps against any local union officers or members failing to comply with this provision.

■ The trial court found as a fact that the locals did not disband and were not suspended. Assuming that this finding is in reality a conclusion of law, we are in accord with it. There is no express provision subjecting a local to forfeiture of its funds and property if it secedes, but does not disband, and affiliates with another parent organization.

It is not implausible that this contingency was deliberately omitted from the forfeiture provision. If a local is suspended, or if it disbands, presumably it can no longer perform its union function of collective bargaining, and consequently its funds and property cannot be devoted to their primary purpose. Still, they can be used for the benefit of laborers in the industry generally if they are turned over to the international, and this is not alien to their intended purpose. But if a local union secedes and affiliates with another parent and can continue to function as a bargaining unit, the funds can best be devoted to the use for which they were intended by allowing them to remain with the local.

Therefore, to give the words used in article XII, section 4, their ordinary meaning does not lead to an unreasonable and improbable interpretation of the provision. If this is a strict construction of the provision, it is not out of harmony with the law.

In *Scott v. Donahue,* 93 Cal. App. 126, 269 Pac. 455, 93 Cal. App. 795, 269 Pac. 458, *motion denied* 94 Cal. App. 795, 271 Pac. 1100 (1928), the court refused to hold that a parent organization was entitled to the sick benefit fund of a local on its dissolution, strictly construing the language of the constitution as it pertained to forfeiture. This case is cited as expressing the general rule in 46 C.J.S. *Insurance* § 1442 (1946) at 775. Another case construing a parent organization's constitution strictly to avoid a forfeiture on the part of a local is *Grand Lodge, IAM v. Reba,* 97 Conn. 235, 116 Atl. 235 (1922). In that case, it was held that the word "lapsing" in a provision headed by the words "merging and

disbanding" did not include the severance of a local by reason of its charter having been revoked by the international.

Also, in *McCarty v. Cavanaugh,* 224 Mass. 521, 113 N.E. 271 (1916), it was held that a local "seceded" and did not "disband" when the entire membership withdrew, and it was entitled to retain its funds.

A contrary position was taken by the California court in *Brown v. Hook,* 79 Cal. App. 2d 781, 180 P.2d 982 (1947), where the court, although recognizing the applicability of the rule of construction set forth in *Scott v. Donahue, supra,* found by reading the constitution as a whole that the word disband, as used therein, included the meaning "to secede." In reaching this conclusion, the court found that the local unions were not autonomous but were tightly controlled and directed by the international. The court held that, upon secession, the local was automatically dissolved.

This latter case is not helpful if we are to follow our own cases which have held that, where the entire membership of a local disaffiliates and then affiliates with another parent, it retains its identity and autonomy. We are of the opinion that the approach taken in those cases is more realistic than that adopted by the California court in *Brown v. Hook, supra.*

According to Merriam-Webster Third International Dictionary (1964), to "disband" means to break up, to scatter, to disperse. No word such as "withdraw," "secede," or "disaffiliate" is given as a synonym.

■ This court subscribes to the principle that provisions for forfeitures are not favored and are never enforced in equity unless the right thereto is so clear as to admit of no denial. *Rocha v. McClure Motors, Inc.,* 64 Wn.2d 942, 395 P.2d 191 (1964); *Hyrkas v. Knight,* 64 Wn.2d 733, 393 P.2d 943 (1964).

■ We conclude that the trial court rendered the proper judgment in this case, although it rested its decision on theories which we do not find it necessary to adopt. The trial court can be sustained on any theory within the plead-

ings and proof. *Lundgren v. Kieren,* 64 Wn.2d 672, 393 P.2d 625 (1964).

We recognize that, by disposing of this case on the narrow ground that the contract language is not broad enough to include a separation by disaffiliation, we do not answer the question whether such a provision, couched in sufficiently broad language, should nevertheless be held ineffective where the funds and property can best be devoted to their trust purposes by allowing them to remain with the local.[5] However, since it is not necessary to answer that question now, we deem it wisest to decide the case on the ground stated. Perhaps, before such a question reaches this court, an appropriate legislative body will have found it in the public interest to enunciate a policy on this question, in the form of a statute.

The judgment of the trial court is affirmed.

WEAVER, HUNTER, HAMILTON, HALE, NEILL, and McGOVERN, JJ., concur.

FINLEY, C. J., and HILL, J., concur in the result.

---

[5]See discussion in article by Yale Professor of Law Clyde W. Summers, *Union Schism in Perspective: Flexible Doctrines, Double Standards, and Projected Answers,* n. 3, *supra.*