Alvino, Appellant, *v.* Carraccio.

Argued April 22, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused July 18, 1960.

*Francis T. Anderson,* with him *John Patrick Walsh,* and *William J. Butler,* of the New York Bar, for appellants.

*Edward Davis,* for appellees.

OPINION BY MR. JUSTICE BOK, June 30, 1960:

We have appeals from five persons in two equity suits. Both suits and all appeals concern the same questions. The complaints request an injunction, an order to pay over money and property, an accounting, and damages.

In both cases plaintiffs are special trustees for two local labor unions, Nos. 6 and 492, appointed by the General Executive Board of the International Union of which the locals were members. The defendants are members and officers of the two local unions.

The name of the International is the Bakery and Confectionery Workers' International Union of America, and hereafter we will refer to it as the BCW. This

entity was expelled by the American Federation of Labor-Congress of Industrial Organizations, which we will refer to hereafter as the AFL-CIO. The reason for its expulsion was the proved existence of corruption within the BCW.

As soon as the BCW was expelled, the two locals seceded and disaffiliated from it and retained their property and assets. Almost at once the AFL-CIO chartered a new International, the American Bakery and Confectionery Workers' International Union, which we will refer to hereafter as the ABC, and the two locals joined it.

The BCW remains outside of the AFL-CIO. Its position is that the locals had no right to secede and have none to retain their assets. The court below at first issued a preliminary injunction in order to keep the assets intact, but after final hearing dissolved it and dismissed the complaints. The plaintiffs have appealed. Only the appeal taken by Olson in each case is being pressed, and they present the same questions: appellants do not press the contention that the disaffiliations were ineffectual.

The long record and briefs give the case a complexity it inherently lacks. The picture is one of an International Union dominated by one man whose corruption was proved after full hearing by the Ethical Practices Committee of the AFL-CIO, following exposures in the labor-management field by an investigating (McClellan) committee of the United States Senate.

The trouble began when the Secretary-Treasurer of BCW, a man named Sims, filed charges against Cross and Stuart, respectively President and Vice-President of the BCW, on March 3, 1957. Stuart shortly thereafter resigned and he disappeared from the case. On March 7 and 8 the General Executive Board of BCW met and cleared Cross and Stuart of

all guilt but filed charges against Sims, found him guilty, and suspended him. On March 12 the locals called for the resignation of Cross and the re-instatement of Sims. On March 15 President Meany, of the AFL-CIO, ordered an investigation of BCW. Late in March the locals managed to set up an Integrity Committee within BCW to preserve its honor, so far as it could. Between May 7 and August 1 the Ethical Practices Committee of the AFL-CIO held hearings and on September 16 reported its findings of corruption. On September 25, the Executive Council of AFL-CIO approved the report and directed BCW to correct the abuses by electing new officers and barring from re-election those whose corruption had been proved. BCW then expelled Sims finally and declared its intention to remain in the AFL-CIO. On October 25 the Executive Council of AFL-CIO directed BCW to reinstate Sims, to bar corrupt officers from re-election, and called a special convention to hear BCW's appeal. Upon its refusal to comply with these directions, it was suspended by President Meany. On November 19 the locals called on BCW to comply with the directives and to stay in AFL-CIO. On December 9 the Appeals Committee of the Convention approved the action of the Executive Council and recommended to the Convention that the Executive Council be given power to expel BCW on or before March 15, 1958. On the same day the Convention adopted the report of the Appeals Committee by more than a two-thirds vote. On December 10 and 11 the locals took action to disaffiliate from BCW and to continue affiliation with AFL-CIO. On December 12 AFL-CIO formally expelled BCW and chartered ABC, the new International Union. On December 17 plaintiffs were appointed special trustees of the locals by BCW. On December 26 ABC granted charters to the locals: 125 out of 290 locals, with 75,000 out of 136,000 members, also disaffiliated from BCW and joined ABC.

In January, 1958, these suits were begun, and in March a special convention of BCW ratified all that Cross and its General Executive Board had done.

The corruption proved against Cross by the Ethical Practices Committee of AFL-CIO was: (1) improper financial relations with an employer in the baking industry, (2) the acceptance of a Cadillac car paid for by a union under trusteeship and its concealment on the books, (3) improper expenditure of union funds and commingling them with his own, and (4) the Executive Board's failure to proceed against Stuart, to expel him in the face of plain documentary proof of his misuse of union funds, and to require restitution.

To complete the factual picture, BCW was organized in 1886 and affiliated with the AFL in 1887; Local 6 was chartered by BCW in 1896 and Local 492 in 1939; and the AFL and CIO merged in 1955 and BCW affiliated with the new entity. It is not denied by anyone that such affiliation carries real benefits to the component unions. Locals 6 and 492 now have 4,000 and 2,600 members, respectively.

The foregoing facts were established partly by testimony but mainly by stipulation, and the appellants do not contend that the findings of fact by the court below, which are summarized above, lacked supporting evidence.

It is of course true, as we said in *Grand Lodge v. Girard Lodge,* 384 Pa. 248 (1956), 120 A. 2d 523, quoting from *Polin v. Kaplan,* 257 N.Y. 277 : " 'The constitution and by-laws of an unincorporated association express the terms of a contract which define the privileges secured and the duties assumed by those who have become members. As the contract may prescribe the precise terms upon which a membership may be gained, so may it conclusively define the conditions which will entail its loss.' " See also *Williams v. National Or-*

*ganization of Masters, Mates, and Pilots of America, Local No. 2*, 384 Pa. 413 (1956), 120 A. 2d 896.

It is also true that Article XIV, Sec. 8 of the BCW Constitution, provides: "Should a local union dissolve, secede, or have its charter revoked all its money and property shall revert to the ownership of the International Union, and the International Secretary-Treasurer may authorize, in writing, a member of a nearby local or a representative to take charge of and turn same over to the International Union . . ."

But the doctrine of frustration of contractual purpose also exists in Pennsylvania. In *Greek Catholic Congregation of Olyphant Borough v. Plummer*, 338 Pa. 373 (1940), 12 A. 2d 435, we said: "There is in the law the doctrine of 'frustration', which holds that under the implied condition of the continuance of a contract's subject-matter, the contract is dissolved when the subject-matter is no longer available. In Nitro Powder Co. v. Agency of Canadian Car & Foundry Co., 233 N.Y. 294, 135 N.E. 507, Judge POUND said: 'When people enter into a contract which is dependent for the possibility of its performance on the continual availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved.' See also Clarksville Land Co. v. Harriman, 68 N.H. 374, and Howell v. Coupland, 1 Q.B. 258. In the leading English case of Tamplin Steamship Co., Ltd., v. Anglo-Mexican Pet. Products Co., Ltd., 2 A.C. 397, it is said at 403: 'A court can and ought to examine the contract and the cirmcumstances in which it was made, not of course to vary, but only to explain it, in order to see whether or not, from the nature of it the parties must have made their bargain on the footing that a particular thing or state of things would continue to exist. . .'" See also *West*

*v. Peoples First Nat. Bank & Trust Co.,* 378 Pa. 275 (1954), 106 A. 2d 427, and cases cited.

Plaintiffs contend that the *Grand Lodge* case controls because it insists upon a local union's obedience to the constitution to which it once agreed. The principle of the case is sound but it has no application. There the locals refused to turn over to the International a certain *per capita* tax included in the dues, as required by the constitution, and we held that they must do so. There was no basic corruption, as in the case before us.

Plaintiff's argument is that when the AFL-CIO ordered BCW to make Cross ineligible to run for re-election it was demanding the impossible, since Cross met the qualifications for office contained in the constitution and these couldn't be changed without amending the constitution, which couldn't be done in time. They are that he must be a citizen, must be a dues paying member of the International for two years, and must have worked for two years as a wage-earner. Obviously no set of minimum qualifications can lock a man into an office against his own misbehavior. No one argues that BCW was not bound by the constitution of the AFL-CIO, and certainly BCW acknowledged it when it appealed the action of the Executive Council to the Convention. Article II, Sec. 10, of the Constitution reads: "To protect the labor movement from any and all corrupt influences and from the undermining efforts of communist agencies and all others who are opposed to the basic principles of our democracy and free and democratic unionism."

Article VIII, Sec. 7, reads: "Sec. 7. It is a basic principle of this Federation that it must be and remain free from any and all corrupt influences and from the undermining efforts of communist, fascist or other totalitarian agencies who are opposed to the basic prin-

ciples of our democracy and of free and democratic trade unionism. The Executive Council, when requested to do so by the President or by any other member of the Executive Council, shall have the power to conduct an investigation, directly or through an appropriate standing or special committee appointed by the President, of any situation in which there is reason to believe that any affiliate is dominated, controlled or substantially influenced in the conduct of its affairs by any corrupt influence, . . ."

There can be no doubt of the right and power of the AFL-CIO to expel BCW upon a finding of corrupt practices. Even without the specifically enabling provisions above quoted, such an organization would have the inherent power to clean house. It is a mere quibble to argue that only Cross and not BCW was found guilty of corruption, nor is it the fact. The report of the Appeals Committee said: "The Ethical Practices Committee concluded that the Bakery and Confectionery Workers' Union does not meet the ethical standards required by the AFL-CIO Constitution because", and there followed the four specific acts of corruption listed earlier in this opinion.

On the other branch of misconduct by a union, that of communist domination, litigation arose after the expulsion of the United Electrical, Radio, and Machine Workers of America (UE) from the CIO in 1949. See *Clark v. Fitzgerald*, 197 Misc. 355, 93 N.Y.S. 2d 768 (1949); *Duris v. Iozzi*, 6 N.J. Super. 530, 70 A. 2d 793 (1949); *Local 1140 v. UE*, 232 Minn. 217, 45 N.W. 2d 408, 19 CCH Lab Cas. #66,098 (1950). In the *Duris* case the court said: "To hold that members, so invited and enrolled, cannot emancipate themselves when the basic and inducing affiliation is destroyed, is not alone to do violence to a fundamental and controlling condition of membership but to impose a form of serfdom

degrading to the individual and harmful to the public. Such evil result must be avoided and there is nothing in the law of contracts that bars the way. . . ."

Accordingly we hold that upon the expulsion of BCW the constitutional obligations binding the locals to it were abrogated; that the loyal locals had the right to secede and disaffiliate; and that they had the further right to retain their assets.

The decree is affirmed at the cost of appellants.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

We here have adjudicated the property rights of the Bakery and Confectionery Workers International Union of America through proofs made before the Ethical Practices Committee of the AFL-CIO. This is the novel procedure now sanctioned by our Court. The court below relied only upon the conclusions of the AFL-CIO and not upon proofs submitted to it. Hence I would vacate the decree and return the record for further proceedings.