Argued March 15, reversed and remanded May 17, 1961

## CROCKER ET AL *v.* WEIL ET AL

361 P. 2d 1014

*Stephen I. Schlossberg,* Washington, D. C., and *William A. Babcock,* Portland, argued the cause for appellants. With them on the briefs were Van Arkel & Kaiser and Henry Kaiser, Washington, D. C., and Babcock & McLeod, Portland.

*Richard R. Carney,* Portland, argued the cause for respondents. With him on the brief were B. B. Bouneff and Tanner & Carney, Portland.

Roy F. Shields, Portland, filed a brief as amicus curiae.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

SLOAN, J.

The named parties appear in a representative capacity only. The real disputants are the Bakery and Confectionery Workers' International Union of America and its formerly affiliated Portland Local No. 364. Plaintiff Crocker is the officially designated representative of the international union. Plaintiff Boster is alleged to be representative of any members who remained loyal to the former affiliation with the international union. When we use the word "plaintiff" we will refer to Crocker only. Defendants Weil and Van Cleve are officers of the local union. They appear as representatives of all of the members of the local and individually. The defendant bank and savings and loan organizations are in court as stake-holders only. They have no other interest in the case and no further reference will be made to them.

On May 2, 1959, the local union, for reasons later explained, seceded from the international. This proceeding in equity challenges the right of the local to

take with it the money and property it had accumulated prior to the secession. The problem presented by the case is generated by a provision of the constitution of the international union which required the assets of a seceding local to revert to the international union. Both sides accept the concept that the international constitution forms a contract between the local, and its members, and the international. *Way v. Patton et al,* 1952, 195 Or 36, 241 P2d 895, and many similar cases unnecessary to cite. Defendants, however, claim that the facts peculiar to this case should prevent the forfeiture decreed by the constitutional mandate. Defendants counterclaimed for money held by Crocker which had been paid to him in his representative capacity by an employer of members of the local union, the National Biscuit Company. The payments had been made as the result of individual agreements between members of the local and that employer providing for a check off of union dues. The trial court found for plaintiffs on all issues, defendants appeal.

There are three organizations to which frequent reference will be required. They are: Local No. 364. It will be called "local". The Bakery and Confectionery Workers' International Union, to be referred to as "international"; and the AFL-CIO confederation of unions to be referred to as "federation". Other organizations and particular persons involved will be referred to by name as they appear in this exceptionally voluminous and complicated record.

The international, as its name implies, was an international labor organization first formed in 1886. In 1887 it was one of the unions which joined to form the American Federation of Labor. It retained that affiliation until 1955 when it participated in the merger of the AFL and CIO. The international retained its

affiliation in the federation until it was expelled from that organization in December, 1957.

The local was formed in Portland in 1937. Its jurisdiction was limited to "Candy, cracker, cookie, macaroni, ice cream and miscellaneous workers." It was the bargaining agent in respect to each of the employers of the members of the local. We are not advised of its geographical jurisdiction. It had about 900 members.

The convention of the international, held every five years, was the governing body of the organization. The constitution was amended from time to time at these conventions. We are particularly concerned with the constitution as amended by the regular convention in 1956 and at a special convention in 1958. The pertinent provisions are not materially different in the two documents. The section of the 1958 constitution that provides the basis of this suit and which plaintiff contends requires the forfeiture of the local's assets is found in Article XIV:

"Sec. 8. All funds and property of the local union shall be held by it in the name of the local union to be used only for the purpose of effectuating the objectives of this Constitution and in accordance with its provisions.

"Should a local union dissolve, secede, or have its charter revoked all its money and property shall revert to the ownership of the International Union, and the International Secretary-Treasurer may authorize, in writing a member of a nearby local or a representative to take charge of and turn same over to the International Union. The General Executive Board may prosecute any officer or member of any such local union who shall refuse to deliver to such authorized member or representative any of the said funds and/or property.

"If the defunct local is reorganized within one

year then the funds and property taken over by the International Union shall become the funds and property of the reorganized local, except that any expenses of the International Union connected with the recovery of the funds and property or with the reorganization of the defunct local shall be charged against such funds and property."

The constitution also specified certain obligations of the international. Because these particular obligations assume decisive importance we will copy them at a later part of this opinion when specific reference to the duties will be made.

In the five year intervals between conventions the international was governed by the executive board. The general executive board consisted of the international president, the international secretary-treasurer, and the international vice-presidents, about fifteen in number.

Amendments to the constitution made at the convention of 1956 are relevant to the facts later discussed. At that convention the constitution was amended in respect to the election of the members of the executive board and as to its powers, and as to the power of the president. Prior to 1956, twelve of the then eighteen members of the executive board were elected by referendum of all of the members of the union. The 1956 amendment changed this to election by the convention. The powers of the board were expanded. It was given the power to fix the salary of the president, which before was fixed by the convention. And the president was given the power to fix the salaries of several of the members of the executive board. The "judicial" power of the board to try any of its members for any charges of violation of duty was extended. Thus, power of the board to govern and to be the sole judge

of the conduct of its government was complete. The only appeal from any action of the board was to the convention—held every five years.

In identifying the organizations whose powers and functions are material to this case it is necessary to emphasize the merger of the AFL and CIO in 1955. Equally important with the merger was the adoption of the Codes of Ethical Practices evolved by the new federation. There is no need to record any of the events which led to the merger. It is important, however, to state that the international was a strong advocate of the merger. At that time the international was equally ardent in support of the Codes of Ethical Practices. The Codes of Ethical Practices were developed as one effort of the federation to clean house in answer to public and governmental demands aroused by Congressional and other revelations of union corruption and racketeering. The international advised its members that the Codes afforded real protection against misuse of union funds.

The power of the federation to impose sanctions upon any international guilty of violation of the Codes, and the procedure adopted by the federation to try the guilt or innocence of any member union charged with violation was not questioned nor challenged by the international at any time.

The course of events which led to expulsion of the international began in March, 1957, when one Curtis Sims, then the secretary-treasurer of the international, filed charges with the executive board charging the president of the international, James Cross, with corruption and malfeasance in office. There is no need to relate in detail the hearings held by the executive board of the international on these charges. Suffice it to say that at the hearings before the executive

board on the charges of misuse and embezzlement by Cross and one of the other international officers, the men charged were found innocent. The other man charged, Stuart, was later indicted and convicted in the courts of Illinois of the same embezzlement that had been charged by Sims. It is significant that, nonetheless, the international never took any action to recover from Stuart the amount embezzled or to punish him with the union rules of discipline. Sims was immediately relieved of his duties for his trouble. This is important. It demonstrated beyond the power of denial the futility of attempting to invoke the internal procedures provided by the international constitution. It also made it clear that anyone attempting to utilize union machinery would be subject to punishment.

Later hearings by the federation's Ethical Practices Committee, by the McClellan Committee of the United States Senate, and the final consideration of the charges by the general convention of the federation in December, 1957, established to the satisfaction of those groups that the charges of misconduct were true.

The facts disclosed by these several hearings were sufficient to cause the convention of the federation to expel the international from the federation. The cause of the expulsion was the finding that the "Bakery and Confectionery Workers' International Union of America is dominated, controlled or substantially influenced in the conduct of its affairs by corrupt influences in violation of the Constitution of the AFL-CIO." Corruption is evil. But the real sin was the domination which permitted the corruption to go unattended and unremedied.

At the same convention the federation chartered a new international and named it American Bakery and

Confectionery Workers' Union, AFL-CIO. We will refer to it as ABC.

When the federation expelled the international it imposed certain conditions to be met before the federation would permit the international to regain membership. One of these, and the most important, was that Cross be barred from office. The international executive board refused to take that action. Instead, the international called a convention to be held in March, 1958, in Cincinnati, Ohio. The announced purpose of this convention was to give the delegates a free and unhampered choice of retaining Cross or electing someone else as president and to also provide an opportunity to elect a different executive board. This action did not satisfy the governing body of the federation. That body announced that the international could not be reinstated until the dominating corrupt influence, Cross, was eliminated. The federation never deviated from that decision.

The proceedings of that convention reveal that the delegates had no choice. Cross, and the other members of the executive board, were the only persons nominated for the offices. On the balloting for president the delegates were only permitted to vote for Cross or abstain from voting. The election at the convention was remininscent of those "democratic elections" held in Germany under Hitler when the only vote permitted was "Ja."

Both before and after this convention the members of the international were flooded with propaganda from the international officers. This propaganda, in the form of letters and the official magazine, which went to all of the individual members of the union, was adroitly fashioned to paint the international officers, particularly Cross, in heroic form and to castigate

all who opposed them. The propaganda contained continuing promises that the international would again enter the "main stream of the labor movement" as it was expressed by Cross. In addition, there were coercive threats of loss of pensions and welfare benefits of the individual members as well as the loss of all local assets, such as are involved in this case.

Trusteeships were imposed on a number of locals that appeared ready to secede. The members of these locals thereby lost their right of self-government.[1]

The same propaganda was drilled into the delegates at the convention before any vote was taken. To one who impartially reads the proceedings of that convention, and other evidence in the record in respect thereto, it appears obvious that any attempted opposition to those in control would have been futile. It is asking a court to close its eyes to reality to ask it to consider this convention as a free and democratic ratification of the action, and failure to act, of the executive board.

It is now necessary to consider the impact of the preceding events upon the local union and the ultimate act of disaffiliation by the local.

After the expulsion of the international the members and the local officers, who are the parties defendant in this case, were uncertain and confused as to what course to follow. It must be remembered that at all times the officers of the international were making repeated promises that it would be able to reaffiliate with the federation. The local elected the two defendants here as delegates to the Cincinnati

---

[1] The use of power to appoint a trustee of a recalcitrant local union was one of the devices used by the international officers to dominate local unions. It was one of the important acts of misconduct later condemned by the McClellan Committee. The abuse of the power was also one of the important aspects in consideration and enactment of the Labor-Management Disclosure Act of 1959, to be later mentioned. See reports of Congressional Committees in respect to this Act.

convention and instructed them to vote against Cross for president. These men testified that one of the responsible international officers promised them at the convention that if Cross were elected he would immediately resign and treat the election as a vindication. The defendants voted for Cross. Actually, there was no other choice.

In October, 1958, the local, after several previous efforts to meet with an international representative had failed, succeeded in having a meeting attended by an international vice-president and also a representative of the ABC. As a result of that meeting the local members voted to remain with the international. Later other events caused the members concern— primarily the continued failure of the international to take any constructive steps to gain rapprochement with the federation. One of the international officers who testified in the trial of this case admitted that after the convention in March, 1958, until after this local seceded the international did not take any action to gain reaffiliation. The promises continued, but no action. When the international was expelled from the federation this local was also ousted from its membership in the Multnomah County Labor Council and from the Oregon AFL-CIO organization. The ostracism of the local was complete. Later mention will be made of the importance of this to the local. At a meeting, called for the purpose of making final decision held on May 2, 1959, the local voted to withdraw from the international and affiliate with ABC. This was done. The local adopted the name of Local No. 364 of ABC, AFL-CIO. The local was then able to gain the important reaffiliation with other local and state labor organizations.

The international immediately appointed plaintiff

Crocker as trustee of the former local. The record is not convincing that there were any of the members that remained loyal to the former affiliation. Crocker made demand for the delivery to him of the money and assets of the local. This was refused and this suit then followed.

After the expulsion of the international, several locals throughout the United States immediately seceded. Others followed. By the time this case was tried a large number of the locals of the international had seceded. How many is not accurately disclosed by the record. Apparently about one-half of the former membership in the international had withdrawn.

We do not know if actions similar to this one were filed against each of the seceding locals. Our attention has been called to a number of court actions in other states similar or identical to this case. Some of the cases just mentioned involve this particular international and one of its locals. Other cases involve other internationals similarly situated. It appears that the lower court in this case has been the only court that has sustained the right of this international to forfeit the assets of the local. In deciding this case the trial court relied on the theory that the provision of the constitution which allowed a forfeiture of the seceding local's assets was a contract. The court enforced the contract. Before we proceed to discuss the facts and factors which govern our conclusions we think it would be helpful to mention some of the decisions in cases of this kind.

Few of the decided cases have been appealed to courts of highest appellate level. We can find only one case yet decided by such a court. This was in Pennsylvania where the Supreme Court of that state affirmed the right of a seceding local to retain its

property. *Alvino, Appellant, v. Carraccio*, 1960, 400 Pa 477, 162 A2d 358, 40 CCH Lab Cas 66,685. There have been several cases in New York, and other cases have been decided in Illinois, Ohio and New Jersey. Many of the cases are collected and commented upon in Greenberg, *Disposition of Union Assets Upon Disaffiliation*, 33 Temp L Q 152, 1960, and in symposiums found in 45 Va L Rev 203, 1955, and 22 Ohio St Law J (Winter, 1961).

The courts have relied on various theories in deciding these cases. In a similar case involving a local of the United Electrical Workers the Minnesota court held that the affiliation of the international union of electrical workers into the CIO was an implied condition of the local's continued allegiance to the international. And that that condition was broken when the international was expelled from the CIO for communist activity by some of its international officers. It then held that this was a material breach by the international and permitted the local to withhold its funds. *Local 1140 v. United Electrical, R. & M. Workers*, 1950, 232 Minn 217, 45 NW2d 408, 23 ALR2d 1197. See note, on similar cases, 63 Harv L Rev 1413, 1950; Isaacson, *The Local and the International*, 5 N Y U Conf on Lab 413, 1952.

In *Alvino, Appellant, v. Carraccio*, supra, 400 Pa 477, the Pennsylvania court applied the doctrine of frustration. The case involved the same international bakers' union as our case. The court held that the expulsion of the international from the federation and the corruption of its officers frustrated the intended purpose of the constitutional contract and relieved the local of adhering to it.

The Illinois Court of Appeals in *Olson v. Carbonara*, 1959, 21 Ill App2d 69, 157 NE2d 273, leave to appeal

denied, 17 Ill2d 629, also relied on the frustration doctrine. The Ohio Court of Common Pleas in *American Bakery Workers Local 253 v. Russelburg*, 1959, 37 CCH Lab Cas 65,522, 44 L R R M 2055, held that a local was not required to remain affiliated with an organization, this international, that had become so corrupt that it was a disgrace to the nation. The court also commented that the prime value of affiliation with the international was to be part of the labor movement as a whole, in other words, affiliation with the federation.

In *Crawford v. Newman*, 1958, 13 Misc2d 198, 175 NYS2d 903, 907, also involving this same union, the court held that it was "unconscionable to hold that, because a written contract does not expressly so provide, that a contracting party may not, without breaching the contract, disaffiliate from a corrupt and dishonest association. This is especially so when there is at stake the welfare of thousands of members of a union, together with public confidence so essential to maintain peaceful and friendly relations with businessmen, big and small." The court also said that the "violation of a trust so reposed in labor leaders is in and of itself sufficient justification for a local union to call it quits." This case was affirmed by the Appeals Division without opinion at 8 App Div2d 789, 188 NYS2d 943. However, leave to appeal has been granted by the Court of Appeals of New York. The opinion of that court has not been filed at the date of this writing.

One of the most comprehensive and well analyzed opinions we have found is in a case decided by the Supreme Court, Appellate Division, First Department, of New York. *Bradley v. O'Hare*, 1960, 202 NYS2d 141, 11 App Div2d 15, 40 CCH Lab Cas 66,627. The

opinion by Breitel, J., discusses the various theories that have been advanced in deciding these cases. It recognizes that there is a growing understanding of the "large and unique role played" by labor organizations and that the concept of simple contract can no longer apply to all of the ramifications involved. The court applied the obligation of a fiduciary.

"The labor union, in its stratification into local unions, internationals and federations, is a much more complicated structure than that usually found among other types of unincorporated associations. Moreover, it has a vital social purpose—the collective regulation and manipulation of the most significant material relationship of the workers in the economy. Among these several layers of organization the internal constitutions create extensive schemes of private government and purport to dispose of various contract and property rights among the constituent elements. The overriding and expressed purpose is that of advancing the welfare of the worker members, either in the provision of welfare benefits, or in conducting negotiations in collective bargaining, or for the purpose of waging economic war. Thus viewed, insulating language, expressed in terms of simple contract or property law, in the constitutions of the unions offers neither a proper description of the facts nor an effective obstacle to achieving the best interest of the ultimate beneficiaries.

"As the precedents are further examined a dominant thread is evidenced. In each case the court searches for the seat of the beneficial interest and how that interest may be best served. In this search, the court has never been limited by the descriptions of legal title to assets or property contained in the internal constitutions, any more than it has been limited in finding or executing a trust in the documents in which a fiduciary obligation is found.

\* \* \* \* \*

"On this analysis, the entire union structure in its several layers is viewed as a fiduciary one. Each layer may retain assets held by it in accordance with the internal constitutional provisions, provided such retention does not violate but rather implements the fiduciary obligation and the trade-union function. On the same reasoning, the beneficial use of the assets is in the worker members, not in the organizational entity which exists solely for their benefit. A general breach of fiduciary obligations, such as widespread corruption or subversion, forfeits the right of the guilty entity to perform its fiduciary role. In that situation, the assets do not 'revert' to the wrongdoers, but to the beneficial owners. While all the cases may have not said as much, this is what their decisions do, virtually without exception, if not, indeed, without exception." 202 NYS2d 153, 154.

Thus it can be summarized that the courts have applied four basic theories in deciding these cases: The theory of a breach of an implied condition; that the contract has been frustrated; the doctrine of unclean hands and the one just cited, the breach of a fiduciary obligation. All of these theories, except the last one, have been subject to some criticism by the writers[2] and courts.

Regardless of the theory, however, every decision has been in favor of the local. No one has criticized that result.

Before we state our own conclusions we want to mention some of the considerations that have guided us to decision. We cannot say that each fact or factor

---

[2] 33 Temp L Q 152, 1960, supra.
Summers, *Union Schism in Perspective: Flexible Doctrines, Double Standards, and Projected Answers,* 45 Va L Rev 261, 1959.
*Disposition of Union Assets on Disaffiliation,* 45 Va L Rev 244, 1959.
*Effects of a Union Split Upon Property Rights,* 1952 Wis L Rev 139.
And see an excellent symposium discussion of many of the problems mentioned herein in 22 Ohio St L J, (Winter, 1961).

to be itemized is of equal importance, nor that we have set them forth in any order of importance. Each is a reality that must be faced in deciding this particular case—and that is all we are doing. We think also that they are realities that are sometimes overlooked.

■ Until the moment that this local seceded it had performed every obligation it owed to the international. The funds in dispute were the property of the local and necessary to the performance of its duties. This is in part evidenced by the fact that because of the inability to use these funds, pending the outcome of this case, it has been obliged to borrow money to carry on its necessary activities.

■ Unions exist for one purpose only: To improve the lot of the working members—to increase the wages, dignity and status of the man at the machine, the woman at the counter or bench, the unskilled who labor with their hands. It is the ultimate goal of legitimate unionism to gain for the worker every lawful advantage to be gained from an employer. When any union fails in that purpose it no longer has reason to exist. And, of more importance, when an officer of a union, at any level, devotes his energies and the members' money to retaining his place of power and profit rather than performing this elemental duty, he must forfeit his right to this office. This duty is now codified into the Labor-Management Reporting and Disclosure Act of 1959 as reaching the status of a fiduciary obligation.[9]

---

[9] "* * * Section 501(a) [Labor-Management Reporting and Disclosure Act] states in general terms the union agent's obligation to act solely for the benefit of his principal, to be loyal, to refrain from competing with his principal or acquiring conflicting interests, and 'to account . . . for any profits received by him in whatever capacity in connection with transactions conducted by him or under his direction.' The principles stated in Section 501(a) were drawn from the Restatement of Agency in

■ The local union is the core and keystone of the entire union organization. It is the working organization that is responsible for success or failure in the representations between employee and employer. This is not limited to periodically negotiating the terms of a contract. As the established bargaining unit, as this local was, it must represent all employees in the numerous grievances and disputes that arise in the working shop. 29 USCA 159. It is the bargaining unit that is responsible for every direct contact with the employer necessary to improve the conditions and terms of employment.

Moreover, it is the local that the employer calls upon to compel performance of the terms of the contract bargained for and all working rules. It is these day-to-day relationships between the employer and the local that are the most important function of the bargaining unit. *Conley v. Gibson*, 1957, 355 US 41, 78 S Ct 99, 2 L Ed2d 80, 85; *Bradley v. O'Hare*, 1960, 202 NYS2d 141, 153, supra; Cohn, *The International and the Local*, 11 N Y U Conf on Lab 7, 1958; Miller & Stockton, *Local Union Officers*, 8 Lab L J 28, 1957; Isaacson, The Local Union and the International, 3

---

an effort to incorporate the whole body of common-law precedents defining the fiduciary obligations of agents and trustees with such adaptations as might be required to take into account 'the special problems and functions of a labor organization.'

"Section 501(b) authorizes any union member to bring a suit in the federal court in the nature of a minority stockholder's suit whenever his union refuses to sue an officer or employee alleged to be guilty of a breach of fiduciary obligations. The trial judge may allot part of any sums recoverable for counsel fees and expenses. All the usual remedies for breach of trust are available.

"These provisions are potentially among the most important in the LMRDA. * * *" Cox, *Law and the National Labor Policy*, p. 92.

The reports of the House and Senate Labor Committees, both majority and minority, also affirm this view. The reports are too long to effectively quote but we believe the reports, the result of extensive hearings and study by the committee and many experts in the field, must be persuasive to a court in the consideration of the problem at hand.

N Y U Conf on Lab 493, 1950. The authority and responsibility of this local as the bargaining agent gave it substantial autonomy and independence.

■ The ability of one bargaining agent to bring pressure to bear upon a given employer depends, in large measure, upon the strategic importance of the character of the employment involved. Thus, the teamsters' union, which occupies the most strategic and powerful position of all, can successfully impose sanctions upon an employer without help of any related trade union. Not so a union like the one at hand, or the retail clerks, by example. It is difficult, if not impossible, for such a union to successfully impose economic sanction on an employer without the aid of other unions. This does not refer to strikes alone. And the most common and useful sanctions are those imposed at the local level. The evidence demonstrates that while the local was still a member of the council, threat by the local Multnomah County Labor Council to place an employer on the unfair list brought immediate favorable reaction by the employer for the benefit of this local. The coercive weight that an international office in Washington, D. C., can bring to bear upon a recalcitrant employer in Portland cannot be equal to the economic pressure available to the united laboring people within the area. It is argued that loss of membership in the Multnomah Council did not impair the bargaining power of the teamsters' union. That may be true. For the reasons just stated loss of membership in the Council may have been of little consequence to the teamsters. To this local it was a substantial loss of bargaining effectiveness. This affiliation was denied the local, through no fault of its own, by the expulsion of the international from the federation. In this organization one of the real values of the international

to the local, and its members, was affiliation with the federation of unions. This local is indeed representative of why "united action" by all labor unions has been the most often heard battle cry of the labor movement.

■ Membership in the local was compulsory to any person who wanted to work within this industry. The contracts between the local and the various employers, in evidence, all required union membership for every employee. This was permitted by Federal law. Labor-Management Relations Act, 1947, 29 USC 157.

> "* * * Finally, labor unions occupy their present position largely by force of law. Under the National Labor Relations Act a union which acts as the bargaining representative has power, in conjunction with the employer, to fix a man's wages, hours, and other conditions of employment without his assent. The individual employee may not lawfully negotiate with his employer. He is bound by the union contract. As a matter of practice, if not in legal theory, the union also controls the grievance procedure through which a man's contract rights are enforced. The government which gives unions this power has the concomitant obligation to provide safeguards against abuse. The most effective safeguard is legal assurance that unions will be responsive to the desires of the men and women whom they represent." Cox, *The Role of Law in Preserving Union Democracy*, 72 Harv L Rev 609, 610, 1959. (Footnotes omitted).

This is pertinent to the argument that we should decide this case upon the law governing voluntary associations, to be later mentioned.

■ In Oregon Macaroni Co., 1959, 124 N L R B No. 138, p 1007, the National Labor Relations Board applied its schism doctrine to this particular disaffiliation and refused to apply the bar of contract as con-

tended for by the international in that proceeding before the board. See: A Result: Union Division, by Philip Ray Rodgers, a member of the N L R B, 45 Va L Rev 207, supra. Hershey Chocolate Corporation, 1958, 121 N L R B 901.

■ Cross and his conduct of the international was the subject of much attention by the McClellan Committee. The result of that investigation and the hearings held form a part of the report to the Congress of that Committee. We do not mention this as indication that we do or do not accept as true the report as made. We do mention it for this important reason. Devices used by Cross, and a few other labor leaders, by which they gained and maintained complete control of the machinery and money of international unions were the same devices which prompted Congress to enact the Labor-Management Disclosure Act of 1959. The Congress was not, nor are we, so much concerned with particular acts of thievery as with the domination that enabled them to happen without recourse or penalty from within. And it was to this aspect of the McClellan hearings that not only Congress and its committees and experts devoted themselves, but the executive department of the government as well. The Congressional debates and reports of the House and Senate Labor Committees tell us that at least one of the executive departments and the Congress devoted almost two years' study and consideration to find and attempt to enact remedies designed, in part, to prevent such domination by international officers. The Senate Labor Committee reported that the matter of corruption and domination could not be cured or prevented without "coercive" government action; that the members of the dominated unions had neither the power or the tools to enforce any internal remedy.

House and Senate Labor Committee Reports and excerpts from the Congressional debates found in The Labor Reform Law, Bureau of National Affairs, 1959, p 150, et seq. See also Katz and Friedman, *Member Control*, 1961, 22 Ohio St L J 97, (Winter, 1961). Despite this studied determination of the Congress we are told that this comparatively small local should have ousted the dominating officers rather than secede.

Reference to the Act is not intended to express judgment as to any provision of the Act. It has been referred to because the Congress did thereby express two important national policies: One, that union officials owe the duty of a fiduciary and, two, the coercive power of the Federal government is needed and will be used to preserve democratic processes within labor organizations.

■ Lastly, we refer to the aims and duties of the international as set forth in the constitution, Art I, § 2. We will copy § 2 as it was amended by the convention held in 1956. Item (5) in the section was added by the amendment.

"Sec. 2. The aim of the International Union shall be to promote the economic and social welfare of all workers in the baking, confectionery and kindred industries by (1) effective organizational action; (2) progressive improvement in living standards through the reduction of hours of labor, increased wages, decent working conditions, effective job security, establishment and expansion of retirement and welfare benefits, and the elimination of the hazards of unemployment and automation; (3) aid in securing and retaining employment; (4) promotion of the interests of labor unions generally and the Bakery and Confectionery Workers' International Union in particular through continued effort in the State and Federal legislatures; (5) alliance with other labor organizations in matters of com-

mon concern toward the end of mutual protection and organization."

Although we have set forth all of the international's duties, it is item (5) to which we direct particular attention. Not only the amendment itself, but the significance of the date of this amendment must not be overlooked. It was adopted immediately after the merger of the AFL-CIO. We have here, therefore, not an implied condition of alliance with other labor organizations, but an express constitutional mandate. The materiality of the promise is vouched by the fact of the amendment itself. We can only assume that it was believed to be too important to be left unspecified. The prior constitution, when the international was affiliated with the AFL only, contained no similar requirement of affiliation. Needless to say, the promise was broken.

By referring only to obligation (5) we do not mean to infer that the international did or could perform all of the other aims set forth. It did not. It may be said that it performed some collective bargaining as required by obligation (2). There is no evidence that it performed, or attempted to perform, any of the others.

■ With these thoughts in mind we reach our own conclusions. It was most strongly argued that we should apply the contract theory. That is: that the constitutional requirement of forfeiture is a binding obligation and must be enforced. If we rely entirely on the concept that the constitution is a contract it will still not avail plaintiffs. For if it be a contract it is not a contract from which all of the benefits flow in one direction. It is that form of contract defined in Restatement, Contracts, § 266:

"(1) 'Promises for an agreed exchange' in the

Restatement of this Subject means mutual promises in a bilateral contract where the performance promised by one party is the agreed exchange for the performance promised by the other party."

We have just seen that this constitutional contract bound the international to maintain "alliance with other labor organizations * * *." And that this was an express obligation. The promise was material; it was violated by the international.

So then, if it be a contract "then any material failure of performance by one party not justified by the conduct of the other discharges the latter's duty to give the agreed exchange even though his promise is not in terms conditional * * *." Restatement, supra, § 274. The breach of a material, express obligation was sufficient to discharge the local from the demand of forfeiture.

No one has pointed to, nor can we find, any theory or concept of equity which will enforce a forfeiture in favor of one whose breach of the contract has caused the other party to withdraw therefrom.

It was also argued that we must apply the law evolved in the decisions in respect to voluntary associations. In these cases, involving churches and the like, it is said that the individual member has no right to any of the associations' assets, beneficial or direct. That his membership is purely voluntary and when the member departs he forsakes any claim to any part of the assets. Hence, it is said when a local church, for example, withdraws from a parent organization the church has no right to retain its assets. See cases cited and analyzed, Chafee, *The Internal Affairs of Associations not for Profit*, 43 Harv L R 993, 1930; and Isaacson, *The Local Union and the International*, 3 N Y U Conf on Labor, p 503, supra.

The only thing "voluntary" about this organization was that the local had the right to withdraw from membership at any time it chose. Regardless of the outcome of this case the local is not and will not be affiliated with the international. Nor could it be compelled to do so. There was no requirement of any kind that it remain joined with the international. The only question is: When it seceded for the reasons before discussed must it be compelled to forfeit its assets to the international?

Otherwise, what we have already said dissolves this argument. In respect to the individual worker membership in this organization was not voluntary. In fact, there simply is no other form of organization, corporate or otherwise, in which membership therein is directly comparable to the organization we are examining here. There may be similarities in part or in certain relationships, but that is all. Nor has any other form of industrial organization been the subject of so much Congressional and other legislative action as labor unions. This is true not only in respect to their internal affairs but also in their relationships to government and employers. These legislative restrictions and grants of power find no counterpart in society. To repeat what was said differently before: "Unions, under the protection and authority of law, govern the lives of individual workers, controlling their jobs, regulating their conduct, and determining their economic welfare." Summers, *Union Powers and Workers' Rights*, 43 Mich L R 805, 837. He who would solve this case by comparison to some other forms of organization and the respective rights of its members and stockholders can only reach frustration. Isaacson, *The Local and the International*, supra; *The Labor Reform Law*, supra, p 260; Cox, *Union Democracy*,

72 Harv L R 609, supra; and materials cited at footnote (2), p 12.

■ We conclude that upon either of the two theories we have discussed plaintiffs are not entitled to prevail: One, that the international committed an express violation of a material promise of the constitution and thus deprived itself of the right to demand the only performance that could have been required of the local; that is, forfeiture. This is not a matter of frustration of a contract or a breach of an implied condition. It was a breach of a material promise that, as in any other contract of mutual obligation, excuses performance by the victim of the breach. *Prime v. Prime*, 1943, 172 Or 34, 61, 139 P2d 550.

■ Secondly, we are satisfied that the decision in *Bradley v. O'Hare*, 202 NYS2d 141, supra, correctly applies the duties of a fiduciary to union officers. This decision is buttressed with the substantial weight of the policy, before expressed, of the Labor-Management Reporting and Disclosure Act of 1959. And that material breach of that fiduciary duty can nullify the otherwise enforceable obligations of the intra-union compact. In this case we have not only material violation of the fiduciary relationship, but, and this is important, the use of the power vested in the fiduciaries to thwart any attempt to remove them. That power was used to render their position impregnable to any remedy, within the union procedures, of removal, accounting or other process normally available to oust a malfeasant fiduciary. It was actions and conduct of the fiduciaries which forced the local to reach the final conclusion that the only remedy remaining was the disaffiliation action taken. It had no other choice. We will not now reward the defaulting fiduciary with the gain sought as a result of that default.

The decree is reversed with instructions to enter a decree in favor of defendants and a judgment in favor of defendants upon their counterclaim.

O'CONNELL, J., dissenting.

The theory that the constitution of the international union constitues a contract between the international and the subscribing local union has been criticized and in some cases applied without strict adherence to the principles of contract law. The fact remains, however, that "The underlying legal theory defining the role of the court in internal union affairs is that the union constitution is a contract between the union and its members." Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L J 175, 179 (1960).[1] Some form of legal compact exists as a result of the constitution of the BCW International to which Local No. 364 has subscribed and which has given rise to the parent-local affiliation. Our previous cases, in line with the universal rule, have described this form of agreement as a contract. *Quinn v. Marvin*, 168 Or 52, 57-58, 120 P2d 227 (1941); *Carpenters Union v. Backman*, 160 Or 520, 528, 86 P2d 456 (1939); Annotation: Withdrawal of a Local Labor Union or Part of its Membership from the Parent Organization or from a General Association as Affecting Property Rights, 23 ALR2d 1209, 1214-1216 (1952).

There appears to be no objection from any quarter if, in denominating the agreement a contract, it is recognized that the contract must be construed in light of its setting in the field of labor organization. In the interpretation of agreements which define the relationship between unincorporated associations generally,

---

[1] In the article by Summers it is noted that the contract theory is not "woodenly followed" (pp. 192-193), has been "manipulated" (pp. 223-224) and is "at most a rough guide" (p. 222).

and labor organizations specifically, the courts have, in most cases, heeded the special character of the contract binding the organization together.

I think that all members of this court fully appreciate the fact that, no matter how the union constitution before us is described, it is an instrument which must be interpreted in relation to the problems which are present in union organization. We are not agreed, however, as to the solution of the particular problem presented here. In the analysis of that problem it is essential that we keep in mind the interrelationship of the parties and their affiliates. This case does not present simply a conflict between the BCW International and Local No. 364. Involved here is the interest of the entire organization which, of course, includes all of its component bodies.

The BCW constitution created a legal relationship between the BCW International and Local No. 364. Similar relationships were created between the international and other locals. The combination of all of these locals under the central control and leadership of the international makes up the unity of organization which the union constitution was designed to preserve. One of the methods of preserving that unity of organization was the constitutional provision calling for the reversion of funds to the international upon the secession of the local.

It is conceded that a seceding local could not retain funds held by it if its disaffiliation was not warranted. And, on the other hand, plaintiffs as well as the majority would concede, I think, that there could be circumstances under which the provision for a reversion of the local union's funds should not be enforced. The question is: What are those circumstances; when

can the local union secede legally and disregard this express provision for the reversion of funds?

The majority opinion, following the rationale in *Bradley v. O'Hare*, 11 App Div2d 15, 202 NYS2d 141 (1960), relies upon the theory that a breach of the fiduciary duty owed by the international to the local union is legal justification for vitiating the constitutional provision on the forfeiture of funds. The pronouncement that there has been a breach of a fiduciary duty does not solve the problem presented here; it simply introduces us to that problem. The question is: When will a breach of the fiduciary duty by officers of the parent union be sufficient to excuse the seceding local's duty of performance to surrender its assets upon disaffiliation? It will certainly be conceded by the majority that not every act of corruption on the part of an officer of the international is sufficient to justify secession. What then is sufficient? It seems to be suggested that the test is whether the international is "dominated" by corruption. But this again is nothing but a word which, standing alone, offers no guide for making the cleavage between a justifiable and an unjustifiable secession. Nor is the solution found by simply stating the conclusion that the international breached an express clause in the constitution requiring it to maintain "alliance with other labor organizations."

It may be admitted that the maintenance of such an alliance is important to the BCW organization, both international and local. However, if the parties intended the continued affiliation with the AFL-CIO as a condition of the existence of the contract between them it would seem that the condition would have been expressly stated in the constitution. The maintenance of alliances with other labor organizations is stated

in the constitution not as an "obligation" but as one of the "aims" of the international. Whether the continued affiliation with AFL-CIO is material would depend upon the importance of that affiliation to the BCW and its locals. If the alliance with AFL-CIO did not materially aid the BCW organization in its bargaining efforts for increased wages and benefits, the failure to continue the alliance would not constitute a material breach of the contract. The evidence does not establish that the bargaining power of the BCW was made less effective after its expulsion from the federation. There was evidence indicating that after its expulsion BCW International obtained certain benefits for the local unions. It was not shown that the benefits would have been any greater had BCW continued as a part of the federation.

The problem in the present case is not solved by creating a breach of contract out of an "aim" expressed in the union constitution. The real question for solution is: How much corruption in an international union must there be to warrant the destruction of a part of the organization created by the union constitution?

There is little doubt that Cross and his cohorts had control of the finances of the international and there certainly is evidence that they corruptly exploited their power for personal gain. On the other hand, it is equally clear that the international continued to function as the parent union for a substantial number (approximately one half) of locals which remained in the organization despite the corruption.[2] Under such circumstances, it cannot be said that there has been a failure of performance (consideration) on the part of the international with the consequence that

[2] Local No. 114 in the city of Portland was one of these faithful members.

defendants' performance (surrender of assets) is excused.

Much of the evidence in the present case relating to the corrupt conduct of Cross and other officers of the international was hearsay. Most of it is contained in reports which were admitted in the trial court as exhibits, principally the reports of the BCW convention and the proceedings before the Ethical Practices Committee of the AFL-CIO. Much of the balance of the evidence consists of other extra-judicial statements. But even giving full effect to all of this and the other evidence adduced, I do not see how it can be said that the international had become functus officio and thus unable to perform the duties which it owed to the locals. Most significantly, the BCW International continued to serve many other locals just as it continued to act effectively to further the interest of Local No. 364 for the considerable period of time which elapsed between the expulsion of the BCW from the AFL-CIO and the secession of Local No. 364. Further, there was evidence showing that Cross had rectified some of his defalcations and that certain accounting and record controls were instituted in the international's office to facilitate the detection of misappropriations. Stuart, vice president of the international and high in command in the international heirarchy, was removed from office and was indicted, convicted and sent to prison. It is possible that these efforts of ablution were little more than mere window dressing to assuage those who sought to cleanse the union, but we have no basis for making a judgment on the matter either way.[8]

---

[8] It is probably an oversimplification to assume that cases such as this present nothing more than a conflict between the interests of the corrupt established order seeking only the maximum of exploitation and personal

The fundamental weakness in the position taken by the majority is that the corruption of Cross is equated to the corruption of the international union as an entity. And while we are told that the excuse for the defendants' nonperformance is found in the fact that the international itself, and not simply its officers, was corrupt, the fact is that the AFL-CIO demanded, as a condition to reinstatement, only that Cross and Stuart be purged and barred from office and that Sims be reinstated. The AFL-CIO did not demand that the international as an entity be over-hauled. The constitution was not a compact between Local No. 364 and Cross individually; it was an organization agreement binding the local to the parent union. Cross' corruption did not destroy the bonds which joined the unions together; it simply weakened the organization. With his removal and the substitution of a faithful and honest president the international could and probably would regain its strength if in the meantime there was not such a wholesale disaffiliation of locals as to make rejuvenation impossible.

When business associations other than labor unions are afflicted with corrupt officers the courts do not generally permit one of the units of the association to appropriate a part of the organization's assets. The explanation is, I fear, that in the law relating to union organizations, where one of the parties is reputedly

gain and the interests of the downtrodden local and its members, the latter pure in heart, seeking only freedom from corrupt tyranny. As expressed by an authoritative writer in this field, "in these cases virtue is seldom unalloyed or vice unrelieved." Summers, Union Schism in Perspective: Flexible Doctrines, Double Standards, and Projected Answers, 45 Va L Rev 261, 269 (1959). Professor Summers informs us: "The hostility against President Cross of the BCW was not based solely on his misuse of union funds, but was in part based on his efforts to modernize the union structure and allow rationalization and mechanization of the industry. These efforts helped create an opposition faction in the union, and it was this opposition faction which supported the ouster of the BCW and became the core of the newly created rival. Fortune, Feb., 1958, p. 211." Ibid., p. 269, n. 42.

associated with corruption or communist infestation, the courts have injected emotional considerations which are not a sound rationale for decision. I am afraid that because the courts dislike communism and corruption in union *officials* they have punished the parent *union* by depriving it of assets held by local unions who wish to rid themselves of their unsavory association.[④]

The cases involving unincorporated associations outside the labor field teach us that there is another method of dealing with this problem—a method which is consistent with the preservation of the traditional legal norms by which we decide other cases. Before turning to an examination of that method I wish to re-emphasize the crucial consideration in this case, a consideration which, I believe, the majority has overlooked. The international and its various locals constitute a unity of organization. The unity here is not simply that which brings the international and Local No. 364 together; there are other local unions which are drawn into the circle of organization by subscribing to the union constitution. Once brought into the fold each local becomes a part of an interdependent

---

[④] In the cases deciding intra-union disputes it is becoming apparent that courts are applying one rule of law to unions allegedly tainted with communism or corruption and another rule for all others. In cases involving forfeiture of assets clauses upon secession, the courts have almost uniformly enforced the clauses in cases other than those where the international is reputedly afflicted with corrupt or communist officials. In approximately half of the cases involving secessions of locals from left-wing internationals which had been expelled from the CIO, the locals have been allowed to keep their assets despite the forfeiture clause. In all cases, such as the case at bar, where the local seceded from the BCW, the local has been allowed to retain its assets. Summers, Union Schism in Perspective: Flexible Doctrines, Double Standards, and Projected Answers, 45 Va L Rev 261, 265-268 (1959). Similarly, a "double standard" has been fashioned by the NLRB in its application of the contract bar doctrine in allowing or denying petitions for representation elections. Summers, op. cit. supra, pp. 269-274. A similar appraisal with respect to judicial interference or restraint in matters of union discipline is expressed in Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L J 175, 185, 198-199 (1960) ("engaging in communist activities is not only unprotected, but the very taint may lead to outlawry * * * even due process of law is less due when claimed by communists").

group and each must act in coordination with the others to obtain the greatest good for all locals and all the members. The strength of all locals lies in this unity, and the international is the cohesive force which holds them together and gives direction to their common purposes. If one withdraws from the group, the remaining locals are correspondingly weakened. I believe that the majority, in its zeal to punish the international and to protect Local No. 364, has overlooked the fact that there are other local unions in the BCW family which will be harmed by permitting the appropriation of union funds by Local No. 364 upon its disaffiliation.

It is worth repeating to note that the miscreant here was not the international and the local unions under it—the corruption centered in a few union officers. The choice is not to award the assets to either the racketeers or the local which seeks to disassociate from corruption; rather the choice is between the alternative of maintaining the strength and structure of the entire organization and the alternative of allowing Local No. 364 to appropriate and remove from the organization a material part of its total strength. The latter, if allowed, is an easier course for the local to follow (especially since a rival international, the ABC, stands ready to take it in) than the alternative course of setting out upon the arduous task of prosecuting measures necessary to remove the corrupt influences. But the last mentioned alternative is the way of democracy and we should not surrender democracy to anarchy in the interest of expediency. Democracy in unions will be a reality only if union members realize that vigilance and effort is necessary if they are to preserve their union as an effective instrument to serve their interests. Unions can, and must, represent the interests of their constituents. But this can be

only if the constituents recognize that it is their responsibility to take corrective actions for abuses of officers or other internal disorders. This leads us to a consideration of the methods by which the evils complained of can be remedied.

There are two available ways to bring corrupt union officers to book; one is internal union procedures; the other is the regular judicial machinery, civil and criminal.

It is generally agreed that the courts "should not interfere in the internal affairs of labor organization, if union democracy is our goal, until the organization has had a reasonable opportunity to correct any mistakes of subordinate bodies" (Cox, Law and the National Labor Policy, Monograph Series: 5, Institute of Industrial Relations UCLA, p. 104 [1960]), for it is said that "overzealous intervention can weaken and frustrate unions," Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L J 175, 178 (1960).[⑨] On the analogy that governmental administrative remedies must be exhausted before resort to the courts is permissible, it is recognized that union procedures must be first pursued before judicial aid may be sought. See, *Gray v. Reuther*, 201 F2d 54 (6th Cir 1952); *Reigel v. Harrison*, 157 F2d 140, 146 (6th Cir 1947), Cert. Den., 329 US 800, 67 S Ct 493, 91 L Ed 684; *Duffy v. Kelly*, 353 Mich 682, 91 NW2d 916, 920 (1958), modified in other respects 94 NW2d 195; Annotation: Exhaustion of Remedies Within Labor Union as Condition of Resort to Civil Courts by Expelled or Suspended Member, 168 ALR 1462 (1947); Cox, Law and the National Labor Policy,

---

[⑨] "* * * the deep and pervading principle of preserving autonomy of unions constrains courts to give the union full responsibility and opportunity to correct its own mistakes." Ibid. at p. 207. See also, Kahn-Freund, Trade Union Democracy and the Law, 22 Ohio St L J 4, 9 (1961).

Monograph Series: 5, Institute of Industrial Relations UCLA, p. 104 (1960) ; Cox, Rights Under a Labor Contract, 69 Harv L Rev 601, 647-648 (1956); Brooks, Impartial Public Review of Internal Union Disputes: Experiment in Democratic Self-Discipline, 22 Ohio St L J 64, 74 (1961); Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L J 175, 207-212 (1960).

However, it is recognized that an aggrieved member need not exhaust internal remedies if the internal procedures would not afford an effective remedy. Brooks, Impartial Public Review of Internal Union Disputes: Experiment in Democratic Self-Discipline, 22 Ohio St L J 64, 82 (1961); Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L J 175, 207-210 (1960). Frequently union procedures are such that the officials who are charged with infidelity to the union are the very persons who constitute the board empowered to pass upon the question. Brooks, op. cit. supra, pp. 71, 73; Summers, op. cit. supra, p. 207. And too, the procedures may be free from such control yet be ineffective simply because the machinery provided is too cumbersome. Summers, op. cit. supra, p. 208. For example, a remedy by way of an appeal to the union in convention frequently is not effective. See, Brooks, op. cit. supra, p. 73. When it is shown that such internal procedures are unavailing the courts will give relief. *Local No. 373, Etc. v. International Etc., Ironworkers,* 120 N J Eq 220, 184 A 531, 535 (1936); *Madden v. Atkins,* 4 App Div2d 1, 162 NYS2d 576, 585-86 (1957); *Rodier v. Huddell,* 232 App Div 531, 250 NYS 336, 339 (1931); Summers, op. cit. supra, p. 207-210. But those who seek judicial relief must produce evidence showing that the union procedures are not effective. *Gray v.*

*Reuther*, Civil No. 20275, E.D. Mich (Sept. 19, 1960);
*Gray v. Reuther*, Civil No. 20477, E.D. Mich. (Nov. 3,
1960), as cited in Brooks, Impartial Public Review of
Internal Union Disputes: Experiment in Democratic
Self-Discipline, 22 Ohio St L J 64, 77 (1961). See,
*Madden v. Atkins*, 4 App Div2d 1, 162 NYS2d 576,
585 (1957). I do not find sufficient evidence in the
case at bar from which I could conclude that Local
No. 364, its members, or any other interested person
exhausted the internal procedures under the BCW
constitution. Judge Denecke, the trial judge, reaches
the same conclusion in his written opinion.

But assuming that the internal procedures would
not provide an adequate remedy because of the con-
trol exercised by Cross and his followers, there was,
as I have pointed out above, open to Local No. 364
and others the various remedies afforded through
normal judicial procedures. As fiduciaries Cross and
the other defaulting officers entrusted with the union's
affairs, were subject to judicial scrutiny by a court
of equity through a suit for an accounting, *Bell v.
Sullivan*, 183 Misc 543, 49 NYS2d 388, 390-391 (1944);
a receivership, *Sibilia v. Western Electric Etc., Inc.*,
142 N J Eq 77, 59 A2d 251, 253 (1948); *Local No. 11
Etc., Ironworkers v. McKee,* 114 N J Eq 555, 169 A 351,
356 (1933); ("the recreant ones should be ousted from
the positions of trust which they have violated, and
others be appointed in their stead"). See, Katz and
Friedman, Members' Control over Officers, Elections,
and Finances: Equitable Remedies and Modern Devel-
opments, 22 Ohio St L J 97, 101-104 (1961). Or equity
may act through injunction. *De Monbrun v. Sheet
Metal Workers, International Ass'n.*, 140 Cal App2d
546, 295 P2d 881 (1956); *O'Neill v. United Plumbers,
Etc.*, 348 Pa 531, 36 A2d 325 (1944); *Schrank v. Brown,*

192 Misc 80, 80 NYS2d 452 (1948). If the court should find that the election processes provided by the union are not fair it may provide the remedy by which fairness is guaranteed. *Sibilia v. Western Electric Etc., Inc.*, 142 N J Eq 77, 59 A2d 251 (1948); *O'Neill v. United Plumbers, Etc.*, 348 Pa 531, 36 A2d 325 (1944). Or if the board passing upon the grievance acts capriciously or corruptly, or beyond its powers as limited by the union constitution or by-laws, the court has power to set aside its action and provide fair hearing procedures. *Fittipaldi v. Legassie*, 7 App Div2d 521, 184 NYS2d 226 (1959); *Reilly v. Hogan*, 32 NYS2d 864, 868-869 (Sup Ct 1942), affirmed 264 App Div 855, 36 NYS2d 423; *Cohen v. Rosenberg*, 262 App Div 274, 27 NYS2d 834 (1941), affirmed 287 N Y 890, 40 NE2d 1018.

In addition to the civil remedies there is available the whole armory of criminal law sanctions. If Cross and others misappropriated union funds they were subject to criminal prosecutions. Any shortcomings which exist in our criminal law for bringing labor racketeers to account appear to be in the enforcement, and not in the substance, of our criminal statutes. 1959 Proceedings, ABA Section of Criminal Law 28, 32. The authors of a recent article point out the effectiveness of existing criminal laws when diligently prosecuted. Cohn and Lubell, Control of a Labor Union—By Whom, Over What?, 22 Ohio State L J 163, 181-183 (1961). One vivid example of the effectiveness of criminal procedures is the conviction of Stuart, a vice president of the BCW, for embezzlement.

Much is made of the alleged autonomy of the local union and its greater significance in the bakery union organization relative to that of the international. The emphasis of the relative importance of the international

and the locals may be put either way; each is important in its own sphere. Speaking generally of the relationship between the international and the locals it has been pointed out by Isaacson, Conference on Labor (Third Annual), New York University, 493, 501, 502 (1950) that "without the international, * * * there could be no real collective bargaining." The author then sets forth the various reasons for this observation. His conclusion points up mutual dependence rather than relative importance: "In sum, each complement the other, each is essential to the other's successful being."

When a business association of any kind is formed it is generally understood that in the course of carrying on the association's business there will be a certain amount of trouble and discord through which the organization must struggle (indeed, that is precisely the raison d'etre for the surrender of assets clause with which we are here concerned); and it is generally understood that in spite of these difficulties the association will remain in existence, leaving the aggrieved members to the remedies which are consistent with the continuance of the organization which they agreed to maintain.

It may be conceded that if the purpose for which the association was formed can no longer be accomplished the agreement to maintain the organization can be regarded as unenforceable. But, as I have already indicated, the evidence in the present case does not show that this organization cannot function effectively in accordance with the purposes for which it was formed, if the corrupt officers are removed from their positions.

The plaintiff international and the non-seceding locals are entitled to the continued existence of the

organization as provided by the union constitution. The organization cannot long effectively exist if the constitutional provision calling for the reversion of funds upon disaffiliation is not enforceable, for that is the principal sanction it has to assure internal cohesion—it provides the element of discipline which is essential to a democratic system of "ordered liberty." Local No. 364, or any of the membership of the BCW, should pursue their appropriate available remedies, some of which are mentioned above, consistent with the continued existence of the international.

For the foregoing reasons I am of the opinion that the trial court properly held that the money and property of Local No. 364 reverted to the BCW International.

GOODWIN, J., joins in this dissent.